[No. 1637.]

SOUTHERN NEVADA GOLD AND SILVER MINING COMPANY, Respondent, *v.* HOLMES MINING COMPANY, Appellant.

Mining Locations—Veins—Right to Follow—Trial—Harmless Error— Verdict—Impeachment—Affidavit of Jurors—Appeal.

1. Where there was substantial evidence on each side, so that the jury could have adopted the theory of either party, according to the view they may have taken of the testimony, the court on appeal will not disturb the judgment for insufficiency of the evidence.

2. Rev. St. U. S. sec. 2322 [U. S. Comp. St. 1901, p. 1425], provides that locators of mining claims have the right of all the surface included within the lines of their location, and of all the veins, lodes, and ledges throughout their entire depth, the top or apex of which lie inside such surface lines extended downward vertically, although such veins, lodes, and ledges may so far depart from the perpendicular in their course downward as to extend outside the vertical side lines of said surface location; but that their right to the possession of such outside parts of such veins, lodes, or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described through the end lines of their location so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges." *Held,* that the right of an owner of a mining location to follow a ledge beyond his side line is limited to the right to follow the ledge downward—that is, on its dip—and he has not the right to follow it laterally or along its strike; and if there was in defendant's location the apex of a ledge which left his location by crossing its easterly side line, and entered plaintiff's location by crossing its westerly end line, and the ledge turned from defendant's location and entered plaintiff's at such an angle that the portion there could not be reached from defendant's location without following the ledge laterally, or on its strike, the defendant could not extract ore from that portion.

3.  If defendant entered upon a ledge having its apex within the exterior boundaries of plaintiff's location, and extracted ore therefrom between planes drawn vertically downward through the end lines of said location, the right of the plaintiff to recover damages for such acts would not be affected by proof merely that the place from which such ore was extracted could be reached by going continuously through ledge matter from a ledge having its apex within the exterior boundaries of a prior location belonging to the defendant, but it must further appear that such passage from the apex of defendant's ledge is made continuously downward on the dip of that ledge; and if any portion of such passage must necessarily be made either upward, or laterally along the strike, then the plaintiff's right to recover is not affected.

4.  In an action for taking ore from plaintiff's location the evidence showed that defendant had made a net profit of $60,000, and that twenty-nine thirtieths of ore mined was taken from plaintiff's ground. The verdict for plaintiff was for $48,000. *Held*, that any error in an instruction on the measure of damages was harmless.

5.  It is not necessary that the veins apexing in a mining location pass through both end lines of the location in order to entitle the owner to follow the dip.

6.  An instruction to the contrary was harmless error, where no question touching the right to follow the vein or to the possession of the ore depended on the qualification that the deposit should pass through both end lines of the claim, but where the controlling issue was whether the claims of the parties were on the same ledge, and that issue had been clearly defined to the jury.

7.  The affidavits of jurors to the effect that the verdict was reached by averaging estimates by each juror could not be received to impeach the verdict.

Fitzgerald, J., dissenting.

Appeal from the District Court of the First Judicial District of the State of Nevada, Esmeralda County; *C. E. Mack*, Judge.

Ejectment by the Southern Nevada Gold and Silver Mining Company against the Holmes Mining Company. From a judgment for plaintiff, defendant appeals. **Affirmed.**

The facts sufficiently appear in the opinion.

*W. E. F. Deal* and *P. M. Bowler, Jr.*, for Appellant:

I.  The right of cross-examination was denied defendant by the trial court. Plaintiff, to maintain its case, called and examined Fred Corkhill as a witness, who, being duly sworn, testified to the extraction of ore by the defendant; that he was familiar with the work which the Holmes Mining Company, defendant in this action, did in that mine after it took possession of it in October, 1884; that it extracted ore from

the first shaft level, the north stope, northwest stope, old
foot-wall stope, the Yankee stope, the sulphuret winze, the
Corkhill stope, the big winze on the intermediate level,
between the tenth and eleventh levels, above the eighth level
and above the seventh, in the eastern part of the mine, above
the little tenth level, on the ninth level, at the round house
on the seventh level, and from other places in the Holmes
mine, giving the estimated tonnage taken and its approxi-
mate value; that he worked in the capacity of shift boss and
foreman and superintendent while the ore was being extracted;
that the ore was shipped to the mill and reduced. This evi-
dence was given in the direct examination of said witness.
Thereupon the following questions were propounded on cross-
examination by Mr. Deal: "I will ask you whether any of
the ore you have mentioned was taken out of a ledge from
the Chief of the Hill claim or any ledge whose top or apex is
within the exterior boundary lines of the Chief of the Hill
claim at the surface extended downward or from the dip of
the Chief of the Hill ledge? In your direct examination you
have testified from this model as to these different places and
pointed them out to Mr. Treadwell in answer to his questions.
Do you understand this model? A. I do." "Q. Are the
workings of the mine from which this ore was taken out, to
which you have testified, correctly laid down upon the model?
Q. Was this ore taken from a vein? A. It was." "Q. From
what vein was it taken? Q. Mr. Corkhill, you testified that
five hundred tons of ore were taken out of the Holmes mine
from the Corkhill stope, below the first shaft level, did you
not? A. I did." "Q. Was that ore taken from any vein
whose top or apex is within the surface boundary lines of the
Chief of the Hill claim at the surface extended downward
vertically or from the dip of any such ledge? Q. From what
vein was the ore taken at the Corkhill stope? Q. Was the
ore taken from different places you mentioned in your direct
examination, in a vein? Q. What is the Holmes mine about
which you have testified? Q. When you say the ore was
taken from the Holmes mine, what do you mean by the
Holmes mine? Q. Was the ore which you have testified to
as having been taken out by the Holmes Company, taken
from a vein or veins, within the surface boundary lines of the

General Thomas, Northern Belle and Easterly Extension of Northern Belle, or either of them, or upon the dip of any such vein?" All of said questions were objected to by plaintiff's counsel upon the ground that they were not cross-examination, which objections were sustained; to which rulings of the court defendant duly reserved exceptions, and the same are assigned as error, justifying a reversal of the judgment and granting defendant a new trial. The contention of the plaintiff was and is that defendant entered into and upon a vein having its apex within the surface boundaries of the Chief of the Hill mining claim and extracted ore therefrom to plaintiff's damage in the sum of $2,000,000. The subject of the direct examination of this witness was the acts of defendant relative to the extraction of ore from the Holmes mine, the particular locality from whence this ore was taken, naming stopes, levels, etc.; that it was taken from a mine and a ledge; reference was made to the model, to identify and explain the places, locality and circumstance attending the taking of that ore. The door was thus thrown open for a most extended and exhaustive inquiry, and since the witness was sworn to testify to the truth, the whole truth, defendant was entitled to the full benefit of cross-examination, and to make such examination thorough and exhaustive and by leading questions, if necessary. The object of cross-examination is to elicit the truth, to ascertain the whole truth, to strip every concealment there may be in the direct examination. According to the English rule, when a party produces a witness who is sworn and examined, the opposing party is not confined in his cross-examination to the matters upon which the witness was examined in chief. He may cross-examine him upon every issue in the case. This was and is the rule of the English common law, and is the rule which obtains in many of the states of the United States of America. It is the rule which obtains in Nevada by statutory adoption of the common law of England. (Comp. Laws 1900, sec. 3095.) By statutory adoption of the common law of England, nothing to the contrary appearing by legislative enactment on the subject of examination or cross-examination of witnesses, the rule at common law *in re* that subject, not being repugnant to or in conflict with the constitution and laws of

the United States, in the statutory language, "shall be the rule of decision in all the courts of this state." The questions propounded on cross-examination were in line with and related to the subject matter of the direct evidence; the questions were but an inquiry into the facts and circumstances connected with the matters stated in the direct examination of the witness, Corkhill. (*Rush* v. *French*, 1 Ariz. 139, 25 Pac. 316; *Ferguson* v. *Rutherford*, 7 Nev. 386; *Wachstetter* v. *State*, 99 Ind. 290; *Wilson* v. *Wager*, 26 Mich. 452; *Clark* v. *Reinigoo*, 66 Iowa, 510; Thompson on Trials, secs. 405–475.)

II.   The court erred in permitting Mr. Schlessinger, one of the plaintiff's counsel, in the concluding argument to the jury to discuss the question of delaying the trial of this case, and reading papers not introduced in evidence upon the trial, and permitting counsel to discuss the matter of defendant's exercise of peremptory challenge to the juror, McNamara. Counsel got before the jury (notwithstanding objection was seasonably made) facts by way of supposition, which had not been proved, also matters calculated to mislead the jury, which occurred on the impanelment of the jury. The defendant had the absolute right to peremptorily challenge Mr. McNamara without giving any reason therefor, and exercised such right, and the court ought not, against defendant's objections, to have allowed any discussion of such exercise before the jury. Similar conduct in the case of *Berry* v. *State*, 10 Ga. 511, 522, was held "highly reprehensible," the court further saying that "it ought in every instance to be promptly repressed." (*Willis* v. *McNeil*, 57 Tex. 465, 474.) It was the duty of the court, of its own motion, to have interposed and checked counsel in his improper and prejudicial line of argument. (*Earl* v. *People*, 99 Ill. 123; *Forsyth* v. *Cothran*, 61 Ga. 278; *Brown* v. *Swineford*, 44 Wis. 232.) The conduct of counsel in his closing address to the jury in this case should have been controlled by the court. What he said was well calculated to prejudice and mislead the jury so that a fair consideration of the evidence was not given by the jury, thereby depriving defendant of a fair trial. He was upheld in this by the trial court against the objection of defendant, and thereby reversible error was committed.

All courts unite upon the conclusion that where counsel, in their argument to the jury, make statements of prejudicial matters which are not in evidence, it affords ground for new trial.

III.  Plaintiff's instruction No. 5 does not state the law. That instruction told the jury that the owner of a mining location is limited to following his ledge downward; that he has not the right to follow it laterally or along its strike. This is manifest error.  The miner has the undoubted right to follow his vein in its downward course into the earth, and while in that course his vein should depart from a perpendicular and extend outside of the vertical side lines of his claim, he still has a right of extralateral pursuit thereof to the extent he has apex of the vein within the plane of his end lines drawn downward vertically and extended in their own direction.  He is not restricted or limited in the manner of working, following or in pursuit thereof; he may pursue it on its strike; for what is a drift or level on a vein but an opening of the vein along and on its course or strike?

IV.  Plaintiff's instruction No. 6 is not law.  This instruction absolutely ignores the law of apex, for, if it be the fact that the ledge in the Thomas in its course should so curve or bend as to cross the side line of the Thomas, and that the course of that ledge is so bent or curved that its dip within the Chief of the Hill makes a large angle with its dip in the General Thomas No. 3, so that a portion of the dip included within vertical planes drawn downward through the end lines of each of said locations, except by following it laterally along its strike, it does not necessarily follow that because defendant has no right to enter upon or extract ore therefrom that plaintiff has a right thereto.  Nor does it follow that plaintiff has a right to complain, if on account of a curve or bend in a vein it crosses a side line and a portion of the apex is without the lines of either the Thomas or Chief of the Hill.  Neither, in strict legal contemplation, is entitled to so much of the vein thus apexing without either claim.  The instruction is therefore misleading, and serves to confuse the jury, for, though defendant be not entitled to so much of the apex of the vein, which, on account of curvature, is without both plaintiff's and defendant's claims,

plaintiff cannot recover the value of ore extracted, because defendant extracted ore from a place or places it had no right so to do; does not *ipso facto* entitle plaintiff to damages therefor. It must be a taking from the plaintiff which gives the right.

V.   Plaintiff's instruction No. 8 is not law. It is opposed to the spirit, intent, and purpose of the law. It is misleading and confusing. The defendant, having the apex of the vein, ledge or lode throughout its claim, extracted ore therefrom within the plane of its end lines, drawn downward vertically and extended in their own direction, and, it being the prior location, would certainly be entitled to all the rights by the grant of section 2322, Rev. Stat. U. S. The measure of defendant's right would be commensurate with the length of apex of vein. This would materially affect the right of plaintiff to recover damage. Having the prior location, coupled with the apex, and the vein being continuous, as the instruction admits and assumes, by the words "could be reached by going continuously through the ledge matter from a ledge having its apex within the exterior boundaries of a prior location belonging to the defendant," would most certainly affect the right of the plaintiff in this action to recover damage. It would defeat it. Priority of location, covering apex, is all that is required to entitle the locator to the exclusive right of possession and enjoyment of the surface, the principal vein, as well as all other veins which have a top or apex within the surface lines of the location throughout their entire depth, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface location; but such right of possession shall be confined to such portions thereof as lie between vertical planes drawn downward as above described through the end lines of the location so continued in their own direction. Obviously, if the exclusive right of possession and enjoyment is granted, and that without restriction or limit as to the manner of enjoyment, it is entirely immaterial how the passage be made. For, being the owner of a lot, entitled to the exclusive right of possession and enjoyment, the owner could, in the exercise of such right, enter by crawling through the

fence, through the gate, or might, if desired, jump over the fence. So with the exercise of the right granted to veins, lodes or ledges; it may be exercised by working laterally on the strike, downward on the dip, or upward; the manner of exercise is wholly immaterial. Being the owner of the right, that right is measured by the extent of apex within the surface lines. The manner of exercising that right is not controlled by statute. The jury were told by that instruction that, if the place from which said ore was extracted could be reached by going continuously through the ledge matter (*i. e.*, matter between the walls of the ledge) from a ledge having its apex within the exterior boundaries of a prior location belonging to the defendant, the right of the plaintiff would not be affected by such proof. That is to say, plaintiff would be entitled to a verdict in its favor unless such passage was made continuously downward on its dip. We wish to emphasize the fact that the passage made continuously downward has nothing whatever to do with the right; if it be defendant's ledge with top or apex within the surface lines of defendant's prior location, which the instruction admits, no further proof of our right is necessary, for proof of priority of location and of apex conveys the right; it is the right granted by the mining law; we may exercise and enjoy our right in whatever manner we choose within the plane of our projected lines, with but the one single exception contained in the concluding paragraph of section 2322, to wit: "And nothing in this section shall authorize the locator or possessor of a vein or lode which extends its downward course beyond the vertical lines of his claim to enter upon the surface of a claim possessed by another." It is a fact admitted, and which was not disputed through the trial, that the three mining claims, Northern Belle, First Easterly Extension of Northern Belle, and General Thomas No. 3, are the property of defendant. It holds the title in fee simple absolute, comprising the usual common-law right to the surface included within the patented lines and all that is upon and beneath it with one addition and only one corresponding reservation. The addition is the extralateral right to follow the veins, which have their apex within their exterior boundaries, of such claims

extended downward vertically within the planes of the end lines drawn down vertically and continued in their own direction into adjoining ground; the reservation is its counterpart, namely, the right of others to the exercise of the same right. Any lode which has its top or apex within the claims or either of the claims of defendant belongs to the Holmes Company, and it has the right to extract ore therefrom by following such vein either on its course or strike, or in its downward course or dip, or in any manner as suits its convenience. That instruction tells the jury that, notwithstanding the defendant has the vein apexing in its prior location, this does not affect the right of the plaintiff. The right of discovery, that of priority of locations, together with the apex doctrine, has lost none of its significance; it is all-important, and this was by such instruction absolutely and totally ignored.

VI.   Plaintiff's instruction No. 9 is not at all applicable to the case. There was no evidence upon which to base such instruction. None whatever. A comparison of all the evidence shows conclusively that defendant entered upon its mining operations in good faith, was not guilty of fraud or negligence, but has acted throughout fairly and honestly and in the full belief that it had the right to do what defendant did. It has been in court for years steadily, constantly and persistently, contending for its rights, which the evidence clearly shows belonged to it. That instruction given to the jury was inapplicable. But, assuming that there was evidence in the case, the instruction given is erroneous. The measure of damages in cases where the acts of the defendant were done through mere mistake, without fraud or negligence, is that the wrongdoer shall make good the loss, but beyond that he shall not suffer for a wrong committed but not intended; that the injured party shall be restored to his former conditions, or compensation shall be made. The measure of the compensation in this class of cases is the "net proceeds of ore extracted." The net proceeds of the ore extracted furnishes a correct basis of compensation; it is not necessary that the injured party should have more in order that he may have what belongs to him, for, if more is given, the plaintiff would be allowed a profit by reason of an

innocent misadventure of defendant. . The actual costs of mining, transportation, reduction and all other necessary incidental expenditures in reducing the product to money would be legitimate. "The net profits of the mine would be the measure of plaintiff's property, the amount for which plaintiff would be liable for taxation on." Yet this instruction, upon the assumption that it was pertinent at all, did not state the law, for by it the jury were told that they "should deduct from the gross value of the ore extracted the cost of mining the same and bringing it to the surface." The measure of damages laid down by that instruction was not law. Where the tort is committed without fraud or negligence, and through mere mistake and without notice of the rights of a plaintiff, the true measure of damages is the gross proceeds of the ore extracted, less the necessary costs of mining, assorting, sampling, assaying, transporting, milling and all other necessary incidental expense in order to reduce the ore to money. The object of the law is to do justice. The duty of courts is to search for and do right, and where there has been no willful or wrongful injury, but that which has been done is so done in good faith, without fraud or negligence, and through mere mistake, the true measure of damages in cases of this kind is the net proceeds of the ore. (*Waters* v. *Stevenson*, 13 Nev. 157.) The estate of the plaintiff is not, on account of one who thus enters, without notice, without fraud or negligence, and through mere mistake, without a willful, wrongful intent and purpose, impaired or damaged, it being mining property, whose only value consists in the metalliferous ores therein.

. VII. The court, upon objection of plaintiff's attorneys, refused to give instructions Nos. 3 and 10, requested by defendant, but modified the same. By the giving of the instructions as modified by the court said instructions so modified and given did not and do not state the law and are contrary to law, and therefore error authorizing a reversal of the judgment. Upon objection of counsel for plaintiff the requested instructions were not refused, but were modified to cover the objection made. No objection thereto was made by plaintiff's counsel as modified, but defendant reserved objection and exception thereto, and, from the

record thus made, the instruction can be regarded only as given by the court of its own motion. (*O'Neil* v. *Orr*, 4 Scam. Ill. 1; *Morgan* v. *Peet*, 32 Ill. 288; *Town of Earville* v. *Carter*, 2 Ill. App. 34; *Abbott* v. *Striblen*, 6 Iowa, 191; *State* v. *Gibbons*, 10 Iowa, 117; Blashfield's Inst. to Juries, sec. 156.)

VIII. The modification by the court of defendant's instructions Nos. 3 and 10 by inserting therein the words "as pass through both end lines of each of said claims," was error depriving plaintiff of a fair trial. By inserting as above the court absolutely destroyed the instruction as requested. The court thereby told the jury that, in order to entitle the defendant to the extralateral right of pursuit of a vein or lode having an apex within either of its claims, it was necessary that it should not only have the apex, but, in addition thereto, that such vein should pass through, on its course, both end lines of each of said claims, thereby imposing an unwarranted and unlawful condition to the right of following the vein in its downward course into the earth, beyond the side lines of the claim drawn downward vertically. The law requires no such condition. (Rev. Stat. U. S., sec. 2322.) The extralateral right of pursuit is not dependent on the condition that the vein shall extend throughout the claim and "pass through both end lines." In *Del Monte M. & M. Co.* (case 171, U. S. p. 67) the court said: "Hence, whenever a party has acquired the title to ground within whose surface area is the apex of a vein, with few or many feet along its course or strike, a right to follow that vein on its dip for the same length ought to be awarded to him if it can be done"; and at page 89, the court continuing, speaking of end lines, said: "This places a limit on the length of the vein beyond which he may go, but it does not say that he shall not go outside the vertical side lines unless the vein in its course reaches the vertical planes of the end lines." Nowhere is it said that he must have a vein which either on or below the surface extends from end line to end line in order to pursue the vein on its dip outside the vertical side lines. Naming limits beyond which a grant does not go is not equivalent to saying that nothing is granted which does not extend to those limits. Suppose a vein enters at an

end line, but terminates half way across the length of the location; his right to follow that vein on its dip beyond the vertical side lines is as plainly given by the statute as though in its course it had extended to the farther end line.

IX. The jury arrived at their verdict by chance. A verdict thus obtained is illegal and void, and should be promptly set aside. It is apparent from the affidavits contained in the record, that the jury agreed upon the method by which they would and should arrive at a verdict; that they should and did bind themselves to abide the result without further consideration. Such a verdict is vicious; it should not be tolerated. It is not the result of an intelligent discussion and reasonable conviction of any one of the jurors, and, when a jury agree and bind themselves to abide the result obtained in the manner and by the means adopted in this case, we have a right to claim that the supposed fountain of justice is corrupted by a resort to such vicious methods, substituting uncertain hazards, a gambling, speculative, reckless disregard for the right of parties in lieu of their deliberative conclusions, conscientious opinions and beliefs, founded upon the evidence adduced upon the trial and upon which they solemnly promised under the sanctity of an oath to well and truly try, and a true verdict render accordingly. Affidavits of jurors have been received in this state and in other states to show that verdicts have been obtained by chance. (*Lee* v. *Clute*, 10 Nev. 152; *Hoare* v. *Hindley*, 49 Cal. 275; *Hendrickson* v. *Kingsbury*, 21 Iowa, 379; *Stewart* v. *R. R. Co.*, 11 Iowa, 379; 12 How. U. S. 361.) The first case considered by the Supreme Court of the State of Nevada upon the admissibility of the affidavits of the jurors themselves was the case of *State* v. *Stewart*, 9 Nev. 120, in which Judge Hawley recognized the distinction between that case and the case at bar.

X. The statutes of the State of Nevada provide that a motion for a new trial upon the ground of irregularity in the proceedings of a jury by which a party to a suit was prevented from having a fair trial, shall be made upon affidavit. (Comp. Laws 1900, secs. 3290–3291.) The only parties who could have knowledge of such irregularities as are here complained of are the jurors themselves. It appears from the affidavits of jurors filed and used on the motion

for a new trial, on the part of both appellant and respondent, that the verdict was arrived at by chance, and by reason of the method adopted that appellant was prevented from having a fair trial.

*W. B. Treadwell*, for Respondent:

I. The court did not err in sustaining the objections of plaintiff to the questions propounded to the witness Corkhill on cross-examination. It is the law of this state that cross-examination must be confined to the subject matter of the examination in chief, and that any range outside of that is error. (*Buckley* v. *Buckley*, 12 Nev. 423, 440–441, and 14 Nev. 263.) That case furnishes a good example of the rule. There, a witness had testified that, while driving a portion of the sheep there in dispute, he had lost some 550 of them. The court held that it was error to permit him to be asked on cross-examination what was the value of those 550 sheep. In its opinion, the court cites, among other cases, as correctly laying down the rule: *Landsberger* v. *Gorham*, 5 Cal. 452; *Wetherbee* v. *Dunn*, 32 Cal. 106. Two different rules on this subject have been laid down by the courts; one, known as the English rule, allowing cross-examination as to any matter in the plaintiff's case, and the other, known as the American rule, confining it to matters brought out in examination in chief. (8 Ency. Pl. & Pr. 102–104.) Counsel are mistaken in supposing that the case of *Ferguson* v. *Rutherford*, 7 Nev. 385, contains anything contrary to our contention. The court in that case declined to decide which of these two rules it would adopt, for, as it was there shown, the result would have been the same under either rule. But in the later case of *Buckley* v. *Buckley*, 12 Nev. 423, and 14 Nev. 263, which we have cited, it did expressly adopt the American rule, and such is now the law in this state.

II. But, even if these rulings should be admitted to be erroneous, they nevertheless caused no prejudice to the defendant; and, of course, no reversal can be had for error which worked no harm. Defendant was permitted to call the witness as his own, and obtain from him the evidence it had sought on this cross-examination; and this, on familiar principles, cured the error, if any there was. (*Hemminger*

v. *Western Assurance Co.*, 95 Mich. 355, 359; *Grubb* v. *State*, 117 Ind. 277, 284; *Hicks* v. *Whitesides*, 23 Cal. 404; *Schuur* v. *Rodenback*, 133 Cal. 85, 881; 2 Ency. Pl. & Pr. 562; *Patchen* v. *Keeley*, 19 Nev. 404, 408; *Winter* v. *Fulstone*, 20 Nev. 260, 268.) Counsel for plaintiff were not guilty of any misconduct in argument; nor did the court err in refusing to check that argument in the particulars complained of. In their brief, counsel refer to certain matters as occurring during the concluding argument of Mr. Schlessinger for plaintiff; but they have not correctly stated the facts; indeed, they have not stated them at all. The affidavits read were those of W. E. F. Deal and Bert Schlessinger; and, to the extent of any conflict between them, the decision of the trial court as to the facts is conclusive on this appeal. (*State* v. *St. Clair*, 16 Nev. 207, 213.) The remarks which were made by counsel were not improper in themselves, and were but legitimate replies to arguments and statements made to the jury by counsel for defendant. Where counsel on one side refers, in his argument, to matters not in evidence or otherwise improper, the counsel on the other side may reply as to such matters; and a new trial cannot be granted on account of such reply. (2 Ency. Pl. & Pr. 732, and cases there cited.)

III. No exception to the giving or refusal of an instruction is available on appeal, unless it was taken at the trial, and the point thereof particularly stated. (*McGurn* v. *McInnis*, 24 Nev. 370.) Defendant must therefore be now confined to the objections made in the court below. It is also a well-settled rule that each separate instruction need not contain all the law applicable to the point therein stated. The entire series of instructions given are to be read together, as a whole; and if, when so read, they state the law correctly, there is no error, although some of them omit some proper limitations or qualifications, elsewhere stated in the instructions. (*Caples* v. *C. P. R. R. Co.*, 6 Nev. 265, 273–4; *Allison* v. *Hagan*, 12 Nev. 38–60; *Solen* v. *V. & T. R. R. Co.*, 13 Nev. 106–138.) Lastly, it is error for a judge to charge the jury as to a matter of fact; and it is therefore proper to refuse such an instruction when requested. (Const. Nev., art. VI, sec. 12.)

IV. Counsel do not contend that instruction No. 4 does

not correctly state the law; and obviously they could not successfully make such a contention. All that they claim is that it was immaterial whether or not defendant had the right to go beyond the side lines of the General Thomas, unless it also appeared that that vein had its apex in the Chief of the Hill. That objection is obviously unfounded; for, when the whole instruction is read, it will be seen that it gave no right of recovery to plaintiff, except upon the proof of the latter fact. But, even if that additional qualification had not been given in that instruction, defendant would not have been injured. In instructions 6 and 9, given at the request of defendant, the jury were expressly instructed in accordance with defendant's contention. Those instructions were as follows: "6. It is entirely immaterial what is the course or dip of any vein in the Northern Belle, First Easterly Extension and General Thomas No. 3 claim, unless you believe from a preponderance of the evidence that the ore here in dispute was taken from the Chief of the Hill vein or from the dip thereof." "9. In order to entitle plaintiff to recover any damages from the defendant, plaintiff must show by a preponderance of evidence that it is, or was, the owner of a ledge, vein or ore body out of which the ore in controversy was taken, and to do this it is necessary for plaintiff to establish by a preponderance of evidence that the apex of the vein from which such ore was taken was, or is, within the boundaries of the Chief of the Hill vein at the surface, extended downward vertically, and, if the plaintiff has failed to do this, your verdict must be for the Holmes Mining Company, defendant."

V. Instructions 5 and 6, given at the request of plaintiff, are as follows: "5. The right of an owner of a mining location to follow a ledge beyond its side lines, is limited to the right to follow the ledge downward, that is, on its dip; and he has not the right to follow it laterally or along its strike. If, therefore, a ledge so bends or curves in its course or strike that vertical planes drawn downward to the end lines of that location will include a portion of the dip of the ledge which cannot be reached, from that location, without falling laterally or along the strike, then the owner of that location has not the right to enter upon that portion of the ledge, or

to extract any ore therefrom." "6. If the jury find from the evidence that there is within the lines of the General Thomas No. 3 the apex of a ledge which leaves that location by crossing its easterly side line, and which enters the Chief of the Hill by crossing its westerly end line, and which thereafter continues easterly on its course or strike within the side lines of the latter location, and that the course of that ledge is so bent or curved that its dip within the Chief of the Hill makes a large angle with its dip within the General Thomas No. 3, so that a portion of the dip included within vertical planes drawn downward through the end lines of each of said locations cannot be reached from the General Thomas No. 3, without following the ledge laterally or along its strike, then the defendant, as the owner of the latter location, had not and has not the right to enter upon or extract ore from that portion of said ledge." But, although a case precisely like the present one has, perhaps, never been presented to a court, the genius of Judge Field enabled him to foresee and dispose of it. In the great Eureka case (*Eureka Con. M. Co.* v. *Richmond Con. M. Co.*, 4 Sawy. 302; Fed. Cas. No. 4548) that learned jurist said: "What the miners meant by allowing a certain number of feet on a ledge was that each locator might follow his vein for that distance on the course of the ledge and to any depth within that distance. So much of the ledge he was permitted to hold as lay within vertical planes drawn down through the end lines of his location, and could be measured anywhere by the feet on the surface. If this were not so, he might by the bend of his vein hold, under the surface along the course of the ledge, double and treble the amount he could take on the surface. Indeed, instead of being limited by the number of feet prescribed by the rules, he might in some cases oust all his neighbors and take the whole ledge. No instruction is permissible which would substantially defeat the limitation of quantity on a ledge, which was the most important provision in the whole system of rules. Similar rules have been adopted in numerous mining districts, and the construction thus given has been uniformly and everywhere followed. We are confident that no other construction has ever been adopted in any mining district in California or

Nevada. And the construction is one which the law would require in the absence of any construction by miners."

VI. Section 2336 of the Revised Statutes reads as follows: "Where two or more veins intersect or cross each other, priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of intersection; but the subsequent location shall have the right of way through the space of intersection for the purpose of the convenient working of the mine. And where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection." The instruction is in exact accordance with that statute as construed by the courts. (Lindley on Mines, par. 557, 614.) Counsel are mistaken in saying that the statute relates only to a union of veins on the dip; and the cases cited by them do not sustain them. On the contrary, they show that that section refers to two kinds of intersection or union, one on the strike and one on the dip; and such is the undoubted construction of the section. They also say that the words "space of intersection," used in that section, are of doubtful meaning, and should have been explained by the court. If that were so, defendant should have requested an instruction explanatory of those words; and, not having done so, it cannot complain on that ground. *Allison* v. *Hagan*, 12 Nev. 38.)

VII. Plaintiff's instruction No. 8 was as follows: "8. If you find from the evidence that the defendant entered upon a ledge having an apex within the exterior boundaries of plaintiff's location, and extracted ore therefrom between planes drawn vertically downward through the end lines of said location, the right of the plaintiff to recover damages for such acts would not be affected by proof merely that the place from which such ore was extracted could be reached by going continuously through ledge matter from a ledge having its apex within the exterior boundaries of a prior location belonging to the defendant. In order that such proofs should avail the defendant, it must further appear that such passage from the apex of defendant's ledge is made continuously downward on the dip of that ledge, and if any portion of such passage must necessarily be made either upward, or

laterally, along the strike, then the plaintiff's right to recover is not affected." Now, it is very evident that if two ledges unite in any manner, it is always possible to make a passage from any point in one of them to any point in the other, continuously in ledge matter, but that does not make them one ledge or affect the rights of the parties respectively to those parts of the ledges which are separate. If, as this instruction assumes, there is an apex in plaintiff's claim, then, so far, are there two ledges; and, as this instruction says, proof in such a case merely that one ledge can be reached from the other, without leaving the ledge, only proves that the two ledges have united, but does not prove that they are one ledge.

VIII. Defendant objects to instruction No. 9, and claims in its brief that this instruction does not correctly state the measure of damages. That objection was not taken in the court below, and therefore is not now available. But, even if that point could now be raised, it is not well founded. In the first place, the first paragraph of this instruction is not as counsel state it. The jury were told that the measure of damages, if the trespass was willful. was the value of the ore extracted, not, as counsel say, the gross value. The court might well have stopped there. Surely, if defendant took out ore, we were entitled to recover its value; and if defendant wished to have the jury instructed as to how that value was to be arrived at, it should have requested such an instruction, which it did not do. Moreover, there can be no question that that paragraph of the instruction correctly stated the law. (*Patchen* v. *Keeley*, 19 Nev. 404.) Counsel claim that the second paragraph of the instruction was erroneous, because, they say, it was held in *Waters* v. *Stevenson*, 13 Nev. 157, 167, that, if the trespass was accidental, or through mere mistake, the cost of milling, as well as mining, should be deducted. But this instruction only told the jury that the defendant would, in such a case, be entitled to a deduction for the cost of mining the ore and bringing it to the surface. It did not say that defendant was not entitled to any further deduction, and defendant did not ask any instruction that it was so entitled. But the case of *Waters* v. *Stevenson* does not decide what counsel say. It was only held in that case that the defendant, if innocent, was

entitled to have the cost of mining deducted; and, though language was there used which might be supposed to justify a further deduction of the cost of milling, no such point was or could have been decided.    The case of *Patchen* v. *Keeley*, *supra*, shows that no such deduction is allowable.

IX. the last objection made by counsel under this head is to the modification by the court of the third and tenth instructions requested by defendant.    As these instructions were to the same point, and the modification was in each case the same, it will be sufficient to set out the third. As requested by defendant, that instruction read as follows: "3. You are instructed that the Holmes Mining Company, the defendant in this action, is, and was, at and before the 1st day of May, 1884, the time of the alleged trespass, the owner, in the possession, and entitled to the possession,. of the Northern Belle claim, the First Easterly Extension of the Northern Belle claim and the General Thomas No. 3 claim; and that each of said claims was located prior to the location of the Chief of the Hill claim, and the defendant is now the owner in fee by United States patents of all of said three claims, and that at all times prior to May 1, 1884, and ever since, is the owner, in the possession, and entitled to the possession of all veins, lodes and ledges of quartz or other rock in place bearing gold and silver or other metals, throughout their entire depth, the tops or apexes of which lie inside the surface boundary lines of said three claims extended downward vertically, and also of the dips of such vein or veins, with the exclusive right to follow such vein or veins and all the ore of such veins on their dip, between planes extended through the end lines of such claims in their own direction."    The court modified this instruction by inserting after the words "and also of the dips of such vein or veins," the words "as pass through both end lines of each of said claims."    It is very clear that this instruction, as requested, was erroneous, and that the court would have been justified in refusing it in toto, and, indeed, counsel do not claim otherwise.    The instruction modified and given contains nothing prejudicial to the defendant.    It does not, as counsel assume, tell the jury that the defendant is not entitled to follow a vein unless it passes through both end

lines. It merely tells them that the defendant is entitled to follow all veins which do pass through both end lines. It was, therefore, so far as it went, entirely in defendant's favor; and, if defendant was entitled to any more, it would have requested a correct instruction. Under no circumstances then can defendant complain of this modification. The Supreme Court of Illinois, 71 Ill. 100 (a case later than any cited by counsel from that court), held that "where a party asks an instruction which should not have been given at all, but the same is modified and given, he will not be in a position to complain of the modification." But, in fact, this instruction, even as modified, gave the defendant much more than it was entitled to, and was therefore erroneous, but it was an error in favor of the defendant, and, therefore, not a ground for reversal on defendant's appeal. As we showed in discussing plaintiff's instructions 5 and 6, the defendant is not entitled to that portion of the dip of the General Thomas ledge, if any, which lies within planes drawn through the end lines of the Chief of the Hill. It was the province of the jury to determine whether or not the course of that ledge was such as was described in the instructions; and the present instruction, as given, invaded that province, and should have been wholly refused. The learned judge of the court below, in his laudable desire to be fair to the defendant, made the mistake, too common in the haste of a trial, of being too favorable to the party requesting the instruction—a mistake of which the defendant cannot now take advantage. This ruling illustrates what we have long believed, that it is safer for a trial judge, who cannot on such an occasion give the matter sufficient consideration, to entirely refuse an erroneous instruction, rather than, by attempting to correct it, expose the adverse party to disadvantage and risk. In any event, however, the court did not err to the prejudice of the defendant.

X. The discussion (if it may be called such) by counsel of the evidence clearly shows that they have ignored the rule, so often laid down by this court, that, where there is a substantial conflict in the evidence, this court will not inquire on which side the preponderance lies. Questions of the weight and preponderance of evidence, and credibility of

witnesses, are for the jury and for the trial court on motion for new trial; and such questions will not be considered by this court on appeal. Among the host of cases to that effect, it is enough for us to refer to *Solen* v. *V. & T. R. R. Co.*, 13 Nev. 106, 135; *McGurn* v. *McInnis*, 24 Nev. 370.

XI.   In the absence of a direct statute to the contrary, the general and well-nigh universal rule is that affidavits of jurors are not admissible to impeach their verdict, and, in particular, are not admissible to prove the matter here relied on by defendant.   (14 Ency. of Pl. & Pr. pp. 905–909.)   But counsel for defendant deny such is the rule in this state, and cite *Lee* v. *Clute*, 10 Nev. 149, as authority in their favor. But no such question was presented or decided in that case, and the court expressly declined to decide it.   Affidavits of jurors were, it is true, considered in that case; but as the court decided that these affidavits did not disclose any grounds for a new trial, it held that it was not necessary to go into this question.   But, on the other hand, the general rule was laid down in *State* v. *Stewart*, 9 Nev. 120, without qualification; and in the later case of *State* v. *Crutchley*, 19 Nev. 368, it was stated in such terms as to leave no doubt of its application here.   Though the affidavit there relied on was not to the same point as in the present case, the court laid down the general rule, as we have stated it, and, saying "If there are exceptions to the rule stated, this is not one of them," it cited a number of cases, in some of which it was directly ruled that such affidavits as were here offered are not within any exception to this general rule. . Among the cases there cited was *Boyce* v. *Cal. Stage Co.*, 25 Cal. 465, which expressly holds affidavits of jurors to this particular point to be admissible.

III.   But, even if these affidavits could be considered, there nevertheless appears no misconduct on the part of the jury, and the verdict is not affected.   Under such circumstances it is clear that counsel's objection is not tenable. Whether the jury did or did not once agree to be bound by the result of the balloting to be taken, and whether or not a verdict reached solely in that way would be vicious, it is well settled that if, after that balloting, they agreed freely upon an amount, whether the same so reached or not, the

verdict cannot be disturbed. That is the rule laid down in
*Lee* v. *Clute*, 10 Nev. 149, cited by counsel. Moreover,
even if it be certain that the jury did previously agree to be
bound by the result of such an averaging ballot, the fact
that the amount finally agreed upon differed, to any
substantial extent, from the amount thus arrived at, con-
clusively shows that they did not abide by the previous
agreement. (*Pruitt* v. *State*, 30 Tex. App. 156; *Barton* v.
*State*, 34 Tex. Crim. App. 613.)

XIII. But, in any event, the action of the jury in this
regard did not injure the defendants, and is therefore no
possible ground for a reversal. In the first place, the
defendant could not possibly have been prejudiced by the
action of the juror, Webster, in putting nothing on his
ballot. The only effect of such an act would be to reduce
the amount of the quotient, and thus make the damages
smaller; and surely the defendant cannot complain of that.
But, besides this, the verdict, as we showed in our argu-
ment as to plaintiff's ninth instruction, was for a sum very
much less than the smallest amount to which plaintiff was
conclusively proved to be entitled, if entitled to anything.
As the matter now complained of did not affect the unani-
mous finding of the jury in favor of plaintiff, but only the
amount of damages, these acts of the jury, if prejudicial to
any one, were to the injury of the plaintiff, and not of
defendant. Of course, the defendant can not be entitled to
a reversal on such a ground.

*W. E. F. Deal* and *P. M. Bowler, Jr.*, for Appellant, in reply:

I. The evidence is insufficient to justify the verdict of
the jury. While it is true that the surface boundary lines
of these four claims are correctly laid down on the plat, it is
not true that the dotted red line, which is on the plat, in
respondent's brief, commences in the Northern Belle claim
and extends to the easterly side line of that claim, thence
across the General Thomas No. 3 claim and through the east
side line of that claim and thence through the western end
line of the Chief of the Hill claim and through the length of
that claim, is warranted by the testimony, or that it finds
any substantial support in the record. There is no dispute

as to the existence of the Holmes ledge, as it is called by witnesses, within the boundary lines of the three claims of appellant, nor of the existence of the Chief of the Hill ledge within the boundary lines of the Chief of the Hill claim at the surface, but the evidence shows that these two ledges are entirely distinct and separate from each other. The Chief of the Hill, at the surface and underground, exists entirely in the serpentine rock which is the hanging wall of the Holmes ledge. The hanging and foot-wall of the Chief of the Hill ledge are both serpentine rock, and there is no vein formation or ledge matter shown in any opening or working either on the surface or underground, or shown upon any map or model in evidence, or by the testimony of any witness which connects the ledge in the Chief of the Hill with the Holmes ledge; on the contrary, every mechanical connection between the two ledges is run through country rock. As we have said in our opening brief, this country rock, which separates the two ledges, is over 600 feet wide at the surface, and 250 feet wide underground, between the nearest points in the two ledges where there is any connection by work. The Chief of the Hill ledge either "peters out" on the surface in its course towards the west end line of the claim, or it turns toward the north side line of that claim. Its limitation on the surface toward the east end line of the Chief of the Hill claim, and in the workings near the surface, is plainly to be seen, and is testified to by all the witnesses, and, in every opening going down the dip, the ledge fades away and "peters out," so that, by the map and model and by the testimony, it clearly appears that the Chief of the Hill ledge is clearly within the end lines of the Chief of the Hill claim, and that on its dip it disappears, and in the openings underground connecting the two ledges there is a division or separation by 250 feet of country rock.

II. The witnesses for appellant and respondent do not differ materially as to what is actually developed by the works in the Chief of the Hill claim. They all agree that the Chief of the Hill lower tunnel, after following the Chief of the Hill vein quite a distance, leaves the Chief of the Hill vein at a point about 43 feet westerly from winze No. 2, and that tunnel then runs towards the Holmes vein a distance of

about 200 feet to a vertical winze going down about 60 feet, and that a drift connects the bottom of that winze with the Holmes eleventh level. They also agree that this lower tunnel is all in country rock, after it leaves the ledge, as is also the winze and part of the drift from the bottom of the winze, but the witnesses for respondent say that this country rock is a "horse" in the Chief of the Hill vein, and that this "horse" does not constitute a separation between the Chief of the Hill vein and the ledge at "12" on the eleventh level of the Holmes mine, at which point "12" they say the Chief of the Hill vein unites with the Northern Belle vein. The facts, however, as appear by their testimony, show that the Chief of the Hill vein, as shown by the workings, exists just as represented in the model and as testified to by appellant's witnesses. The limitations, direction and dip of the Chief of the Hill vein, as shown by the works and in the model and on the maps, and by the testimony, prove almost beyond a doubt that the Chief of the Hill vein has no connection whatever, except a mechanical one by means of a tunnel, winze and drift, with the vein from which the ore in dispute was taken. The course, dip, and limitation of the two veins in controversy being established positively as facts, there is no room for theory or secondary evidence. There being a clear separation of country rock between the two veins established by the direct positive testimony of all the witnesses on both sides, the opinions of expert witnesses are of no earthly force, though the case is here on appeal.

III. The error of the district court in refusing to allow the witness, Fred Corkhill, to be cross-examined, as pointed out in our opening brief, was not cured by the testimony of the witness when called for the appellant. The cross-examination was not upon any new matter. The witness was a disinterested witness and not in the employment of appellant, and the right to cross-examination was taken away by the district court.

IV. It was the duty of the court to construe the certified copies of the notices of locations and patents to the jury. "It is both the province and duty of the court in civil cases to expound to the jury all written instruments and state their effect." (Am. & Eng. Ency. of Law, 2d ed., vol. 23, p.

553, and authorities cited in the notes.) The constitutional provisions that judges shall not charge in respect to matters of fact, but may state the testimony and declare the law, prohibits courts from charging juries as to matters of fact that are in controversy, but does not mean, nor was it intended to mean, that, when a fact is admitted, or when an instrument in writing such as a patent is introduced in evidence, that courts shall not state to the jury the effect of such admitted facts or instrument. The court, by its modification of instruction 3, declared the law incorrectly, and told the jury that the only extralateral right appellant had under the patents was the dip of such veins as passed through both end lines of each of appellant's claims. We claim that the instruction was correct as asked; that it was erroneously changed by the court so as to make it meaningless as applied to the admitted facts and to those proved so conclusively that no court had the right to question them, and that this instruction was entirely as to a matter of law and not as to a matter of fact in controversy.

V. There was no material conflict between the affidavits of Mr. Schlessinger and Mr. Deal. The vice of the action of the court was in permitting counsel for respondent to discuss matters to the jury that were no part of the record. So far as this part of the trial was concerned, as shown by the record here, the trial might as well have been had before a mass meeting where no rules were observed and any man had a right to say what he pleased, but, as we understand the law, counsel, in addressing a jury, must confine their argument to the facts as shown by the evidence.

VI. In the case of *Wright* v. *Illinois and Miss. Tel. Co.*, 20 Iowa, 195, the Supreme Court of Iowa very fully discuss the authorities upon the question of the admissibility of the affidavits of jurors in support of a motion for a new trial to show misconduct of the jury, and finally resolved the question upon principle in favor of their admissibility for that purpose in the absence of any statute upon the subject. The court cites the following English cases as sustaining the admissibility of affidavits of jurors at common law:   *Par* v. *Seames*, 1 Beamer, 320; *Phillips* v. *Fowler*, 1 Beamer, 441; *Metcalf* v. *Dean*, Cro. Eliz. 189; *Vicary* v. *Farthing*,

Cro. Eliz. 411; *Haylor* v. *Hall*, Palm, 225; *Norman* v. *Beaumont*, Wills, 487 (in which Wells, C. J., says it is the settled rule to allow affidavits of jurors); *Harding* v. *Stewart*, 8 Dowl. P. C. 598; *Hindle* v. *Birch*, 1 Moore, 455; *Milsam* v. *Hayward*, 9 Price, 134. In the case of *Hendrickson* v. *Kingsbury*, 21 Iowa, 379, it was held that the affidavits of jurors were admissible upon principle to show that the verdict was obtained by each juror marking down the sum desired by him and adding them altogether and dividing the amount by 12 pursuant to previous agreement. The case of *Darland* v. *Wade*, 48 Iowa, 547, is to the same effect, as to an average verdict being proved by the affidavits of jurors upon principle. (*Warner* v. *Robinson*, 1 Root, Conn. 194; *Bradley's Lessee* v. *Bradley*, 4 Dall. 112; *Elledge* v. *Todd*, 20 Tenn. (1 Humph.) 43; *Bennett* v. *Baker*, 20 Tenn. (1 Humph.) 399; *Harvey* v. *Jones*, 22 Tenn. (1 Humph.) 157; *Crabtree* v. *State*, 35 Tenn. (3 Smeed) 302; *Joyce* v. *State*, 66 Tenn. (7 Baxt.) 273; *East Tenn.* v. *Western N. C. R. R. Co.*, 65 Tenn. (1 Pickle, 241.)

VII. It is respectfully submitted that as, by the statutes of this state, misconduct of the jury can only be shown by affidavit, and that as misconduct of the nature such as that shown by affidavits on both sides can only be shown by the affidavits of the jurors themselves, and that by those affidavits it is proved beyond any question that the verdict of the jury was not a fair verdict, was not the result of any consideration of the evidence by the jurors, but was the result of aggregation and average, the verdict should be set aside and a new trial granted, not only upon this ground, but upon all the grounds which appellant moved the district court.

## On Petition for Rehearing.

*W. E. F. Deal*, for Petitioner:

I. Appellant is taken by surprise as to the conclusion reached by the court relative to instruction No. 3, as the materiality of the instruction in question was never in any manner suggested in the printed or oral arguments, and appellant has not been heard as to this. It was assumed by both sides at the argument that the instruction was material, and the contention of counsel for the respondent in his argu-

ment and brief was not that the instruction was immaterial, but that it, as requested, was erroneous, because, as he claimed, first, it was solely as to a matter of fact; second, because it ignored the claims or issues that the ledge in the General Thomas No. 3 claim passed through both side lines of that claim and not through the end lines; third, because by reason of the bend of that ledge the Holmes Company had no right to follow it at all beyond the easterly side line of that claim, or, in other words, that plaintiff had no extra-lateral right as to that ledge, because, as claimed by respondent, it did pass through both side lines, and that those side lines became end lines of that claim; fourth, because the instruction, as requested, was erroneous, and, as modified, charges that defendant has some rights, though less than it really has; fifth, that the instruction as modified and given, contains nothing prejudicial to the defendant and does not tell the jury that the defendant is not entitled to follow all veins which do not pass through both end lines; and, sixth, that the instruction, as modified, gave the defendant much more than it was entitled to, and was therefore erroneous. This court hold that instruction No. 3, as modified by the district court and given to the jury, was erroneous, but that the modification was immaterial to any issue, and as to these matters say: "The requirement that the mineral vein should pass through both end lines is erroneous. It must be conceded, as decided in the Del Monte Case (171 U. S. 67), that the miner has the right to follow his vein on its dip outside of his vertical side lines, whether the vein ever, in its course, reaches its end lines or not." The modification was immaterial to any issue, and could have misled the jury. No question touching the right to follow the vein or the right to the possession of the ore depended upon the qualification that the mineral deposit should pass through both end lines of the claim. The controlling question, and upon which the case was tried, was whether the General Thomas No. 3 and the Chief of the Hill were upon the same ledge. If they were not, plaintiff had no cause of action. Whether an instruction is material or not depends upon the issues of fact made by the pleadings and upon the *prima facie* case made by the evidence introduced on the part of the party to the suit which

requests the instruction.   The action was to recover posses-
sion of the Chief of the Hill claim, and therein, throughout
their entire depth, the tops or apexes of which lie inside the
surface boundary lines of that claim, and for damages for
the alleged taking by the defendant of ore from such veins.

II.   There was no dispute whatever at the trial about the
title of plaintiff to the Chief of the Hill claim, nor as to the
title of defendant to the Northern Belle and General Thomas
No. 3 claims, but the whole dispute was as to the extralateral
rights belonging to these several claims, as all of the ore in
dispute was taken out entirely outside of the surface bound-
ary lines of all these claims at the surface, extending down-
ward vertically.   Defendant by its answer denied that it had
ever ousted or ejected plaintiff from the Chief of the Hill
claim, or any vein therein, or taken out any ore from any
vein therein, and by its supplemental answer alleged that it
had not mined or extracted any ore from any vein having its
top or apex in the Chief of the Hill claim, but that all the
ore it had ever mined or extracted was from the claims men-
tioned in the answer and from the veins having their apexes
in such claims.   There was no evidence that the defendant
had ever ejected plaintiff from the Chief of the Hill claim,
or from any ledge therein, unless the opinion of the plain-
tiff's witnesses—that the country rock, 700 feet wide at the
surface and 300 feet wide underground, at the nearest points
separating the vein from which the ore was taken from the
vein found in the workings of the Chief of the Hill under-
ground is a "horse," and does not constitute a separation—
is such evidence.

III.   Appellant upon the argument attempted to show not
by the testimony of his witnesses alone, but by that of the
respondent's, that the country rock mentioned is not a
"horse," because it was not shown that the country rock
was surrounded at each end or on both sides, or underneath,
which the vein apexes in the Chief of the Hill claim.   It is
a very grave matter, amounting to a calamity, if it be the
law in this state that the rights to mining claims can be
established or taken away by such opinions.   Whether the
body of the country rock mentioned is or is not "horse," is
susceptible of absolute demonstration, as was testified by

Mr. Anderson.   The uncontradicted evidence being that the vein from which the ore in question was taken was not connected in any actual working in vein matter, but was separated on the surface by 700 feet of country rock from the vein in the Chief of the Hill, and by 300 feet of country rock underground at the nearest point between the two, in connection with the fact, about which there was no dispute, that all the vein matter from which the ore in dispute was taken, as shown by tunnels, drifts, inclines, stopes, and other marks on the map on both sides, and on the model, and by witnesses on both sides, was from a vein which, in in its course, did not run in the direction in the vein in the Chief of the Hill claim upon the surface and in all underground workings done by the plaintiff is shown to run, but that such vein matter runs at right angles to the course of the vein in the Chief of the Hill, is of such weight as not to be overcome by the opinion of any expert to the contrary. The facts testified to by plaintiff's witnesses do not establish even a remote probability that the country rock is a "horse."   It is necessary that the walls of the ledge should converge about the mass of the country rock, beneath it and at both ends.   What are the walls of the Chief of the Hill, and where are they?   The court will look in vain in the record to find where the witnesses for the plaintiff placed either of those walls.   None of the witnesses for the plaintiff did testify where they were.   There is no question here as to the credibility of witnesses, but as to the existence of any evidence of the necessary facts upon which alone a witness is justified in saying that the country rock in question is a "horse."   This court has before it exactly what the jury had, and what the district court had, and this court would not, by reversing the order of the district court refusing a new trial, interfere with the jury system, but would uphold it and perform the duties imposed upon them by the constitution and laws of this state.

IV.   It has been shown what the issues made by the pleadings are.   Now, what was the case made by the evidence upon the part of the defendant?   That case must be examined alone to determine whether the instruction in question was material.   (*Moresi* v. *Swift*, 13 Nev. 220;  *State* v. *Levigne*,

17 Nev. 442; *People* v. *Taylor*, 36 Cal. 265; *Fox* v. *Harvester Works*, 83 Cal. 343; *Davis* v. *Russell*, 52 Cal. 615.) Each party has the right to have the law applicable to the facts, as shown by his evidence, or as admitted at the trial, given to the jury by the trial court. This is the rule, even where the evidence is conflicting. Defendant introduced in evidence three patents issued by the Government of the United States to it for the Northern Belle and the General Thomas No. 3 claim, which establish as a matter of law defendant's ownership of them. It was admitted at the trial that all the ore taken out by the defendant was from between planes made by the northerly end lines of the Northern Belle and the General Thomas No. 3 claims and the easterly end line of the First Easterly Extension of the Northern Belle claim, drawn down vertically through such end line and continued indefinitely in their own direction easterly. The northerly end line of the Northern Belle and the easterly end line of the First Easterly Extension are parallel to each other. It was the duty of the court, under this evidence, to instruct the jury as a matter of law that the defendant was the owner and entitled to the exclusive possession of these three claims, and of all veins, lodes and ledges throughout their entire depth, the top or apexes of which lie inside the surface boundary lines, and also of the right to follow these veins between such surface boundaries of claims outside the vertical side lines. The locations upon which the patents mentioned issued were prior to the location of the Chief of the Hill. There is no other law applicable to the facts stated except section 2322 of the Revised Statutes of the United States; that, and that alone, gives extralateral rights to the owner of a quartz lode mining claim, and by that section and the construction given it by the highest courts of the United States must such rights be governed and determined. While it is true that the respondent contended that the vein in the General Thomas No. 3 crossed both the side lines of that claim on its course and passed through the east side lines into the westerly end line of the Chief of the Hill claim, and the respondent's witnesses did give it as their opinion that such was the course of the vein through the east side line of the General Thomas No. 3 claim, and upon

such opinions the instructions asked for by the plaintiff were given by the court, that evidence and contention of the plaintiff have nothing whatever to do with the question as to the materiality of instruction No. 3. That must be determined by the case as made by the defendant. The court will look in vain through the record to find any instruction in which section 2322, either in substance or otherwise, was given to the jury, or requested to be given, except defendant's instructions 3 and 10, nor was any instruction given, or requested to be given, except those instructions applicable to a case where a ledge, such as that testified to by the defendant's witnesses, exists. The instructions requested by the plaintiff and given by the court charge the jury as to the law applicable to the case made by the plaintiff, but in none of them is the law applicable to the case made by the defendant given. The question to which most of the argument was directed was whether the ore in question was from a ledge whose apex is in plaintiff's claim or from one whose apex is in the defendant's claim, and the witnesses for the plaintiff differed from those for the defendant as to whether the vein in the General Thomas No. 3 and that in the Chief of the Hill was the same, but it by no means followed, if they were not the same, that plaintiff had no cause of action. If the vein from which the ore was taken was from the vein whose apex is in the Chief of the Hill claim, and between planes drawn as described in section 2322, and such vein was a separate vein from that in the General Thomas No. 3, plaintiff was just as much entitled to a verdict as if the veins in the two claims were the same, and the ore was taken from the dip of such vein, yet plaintiff was not entitled to a verdict if such vein in its course passed out of the northerly end line of the General Thomas No. 3, as testified to by defendant's witnesses, and through the side line of that claim, as testified to by the plaintiff's witnesses, at the point on its course shown on plaintiff's map, and in respondent's brief, if the ore taken out by defendant was between planes made by the northerly end line of the General Thomas No. 3 and a plane drawn parallel to such end line through the point where such ledge in its course passes through the east side of that claim, and at a right angle to said side line. Sub-

stantially all the ore testified to was taken out between those planes. (See the maps on both sides, the model, and testimony of Fred Corkhill for plaintiff.) All of the appellant's witnesses testified that the vein in the General Thomas No. 3 does pass through the northerly end line of that claim, and they brought ore from the vein where it so passes with assays showing value in gold and silver. No witnesses on either side testified that the dip of the vein in the General Thomas No. 3 claim was northerly, or between the side lines of that claim in the direction of the northerly end line extended down vertically, but, on the contrary, the dip was shown to be nearly at a right angle with the easterly side line of the claim. No vein matter in any of defendant's claims has a dip toward the north, but that of the Chief of the Hill on the surface, and everywhere beneath the surface, dips toward the north and continues in that direction until it pinches out. Take the plat in the brief for respondent and draw a line parallel to the northerly end line of the General Thomas No. 3 at a right angle to the east side line of that claim, through the point where the red line passes toward the east, and the court will see, by reference to the maps on both sides, and the model, and the testimony of Fred Corkhill for the plaintiff, that the ore in question was taken between those planes and belongs to the defendant under section 2322. "Where such a vein crosses one end of the lines designated by the locator as an end line and departs through a side line the extralateral right is defined to the direction of the crossed located line. A plane parallel to the one drawn to such crossed end line produced indefinitely in the direction of the dip applied at the point where the lode crosses the side line will carve out a segment of the vein throughout its entire depth, which will belong to the locator." (2 Lindley on Mines, 3d ed. p. 1077.) All the witnesses for the defendant, Holmes Mining Company, testified that there was but one vein in the three claims mentioned, which commenced at the east end line of the First Easterly Extension and extended through that claim through its westerly end line into the Northern Belle and General Thomas No. 3 claims, and which passed to and through the northerly end line of both of those claims last mentioned; and this ledge

in those two claims is a wide ledge at the surface, and, as has been stated, passed through the northerly end lines of both. Can there be any question that as to this case made by the defendant's witnesses, in connection with the admitted facts and evidence to the title, that section 2322 of the Revised Statutes was material to the issue, and was only law applicable to that case? Instruction No. 3, as modified by the court, told the jury in effect that extralateral rights depended upon the ledge running through both end lines of the claim, and, if the jury believed that the ledge did not run through the north end line of the General Thomas No. 3 on its course, that the defendant had no extralateral rights even to the extent that it did run in that claim on its course in the direction of that line, and that the defendant in such case had no extralateral rights whatever. If the record shows what is stated in this petition, plaintiff's instruction No. 6 has no bearing upon the materiality of instruction No. 3. Instruction No. 6 does not in any manner relate to extralateral rights, nor as to the law which confers them. That instruction was applicable to the evidence on the part of the defendants, to the effect that the vein in the Chief of the Hill claim at the surface was entirely within its exterior boundaries, and that it disappeared in every working below the surface at the deepest part of these workings.

By the Court, Belknap, C. J.:

This is an action of ejectment for the recovery of the possession of plaintiff's mine and damages for ore extracted. It was tried by the First Judicial District Court and a jury, and a verdict rendered in favor of plaintiff for the possession of the mine, and for damages in the sum of $48,000. A motion for a new trial was made and overruled, and from the order and judgment an appeal has been taken.

It was conceded at the trial that respondent was the owner of the Chief of the Hill claim, and appellant the owner of the Northern Belle, First Easterly Extension of the Northern Belle, and General Thomas No. 3, and that each of these claims of appellant was prior in location to that of respondent. Although the action was in ejectment for plaintiff's mine, the real controversy was whether respondent or appel-

lant was entitled to so much of the General Thomas No. 3 vein as is within the Chief of the Hill location.

Respondent contended that the General Thomas No. 3 and its Chief of the Hill claim are upon the same ledge; that the General Thomas No. 3 ledge crosses its easterly side line, and enters the Chief of the Hill ground at its westerly end line, and thence runs in an easterly direction in the Chief of the Hill ground; that there are two distinct ledges upon the surface—one the Northern Belle, the other the General Thomas No. 3; that the ledges are divided by a body of country rock of varying width, but sufficient to indicate separate fissures; that in the underground workings upon the eighth level of the Northern Belle mine—practically the first level of the General Thomas No. 3, owing to the slope of the hill—the mass of country rock separated the ledges by about 100 feet, and that the separation continued downward to the eleventh level, from which the disputed ore was taken.

The identity of the General Thomas No. 3 with that of the Chief of the Hill was shown in part by a drift through country rock from the Chief of the Hill tunnel, from which a winze was sunk 65 feet to stopes made by appellant upon the eleventh level within the ground of respondent, and was supplemented by expert testimony and that of practical miners to the effect that the ledges were the same, with the reasons upon which the conclusion was based. Appellant contended that the Holmes or Northern Belle ledge extended through each of its claims, to wit, Northern Belle, First Easterly Extension of Northern Belle, and the General Thomas No. 3; that the ledge at the surface is several hundred feet in width, and that there is only one vein in its mining ground; that the country rock between the General Thomas No. 3 and the Northern Belle is not a separation of the veins, but an intrusion within the walls of the ledge, commonly called a "horse" by miners; that there is no ore connection between the General Thomas No. 3 and the Chief of the Hill; that the latter is a separate vein, and either disappears or turns to its northerly side line before reaching the General Thomas No. 3.

It is claimed that the evidence is insufficient to support

the verdict. The evidence was conflicting upon all material points. There was substantial evidence upon each side. The jury could have adopted the theories of respondent or those of appellant, according to the view they may have taken of the testimony, and upon appeal this court could not properly disturb the judgment upon the ground of insufficiency of evidence. The jury adopted the views of respondent. It was sanctioned by the district court in denying a motion for new trial, and for this court now to interfere upon the ground that the verdict is against the weight of evidence would be, in effect, to abolish the institution of juries.

Among the instructions given at the request of respondent are the following:  " (5) The right of the owner of a mining location to follow a ledge beyond his side lines is limited to the right to follow the ledge downward—that is, on its dip; and he has not the right to follow it laterally, or along its strike. If, therefore, a ledge so bends or curves in its course or strike that vertical planes drawn through the end lines of that location will include a portion of the dip of the ledge which cannot be reached from that location without following laterally or along its strike, then the owner of the location has not the right to enter upon that portion of the ledge, or to extract any ore therefrom.

".(6) If the jury finds from the evidence that there is, within the lines of the General Thomas No. 3, the apex of a ledge, which leaves that location by crossing its easterly side line, and which enters the Chief of the Hill by crossing its westerly end line, and which thereafter continues easterly on its course or strike within the side lines of the latter location, and that the course of that ledge is so bent or curved that its dip within the Chief of the Hill makes a large angle with its dip within the General Thomas No. 3 so that a portion of the dip included within vertical planes drawn downward through the end lines of each of said locations cannot be reached from the General Thomas No. 3 without following the ledge laterally or along its strike, then the defendant, as the owner of the latter location, had not and has not the right to enter upon or extract ore from that portion of said ledge."

The objections to the instructions appears to be in the limitation contained in the following words:  "And he has

not the right to follow it laterally or along its strike." Under the provisions of section 2322, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1425], locators of mining claims "have the exclusive right of possession and enjoyment of all the surface included within the lines of their location and of all veins, lodes and ledges throughout their entire depth the top or apex of which lie inside such surface lines extended downward vertically, although such veins, lodes and ledges may so far depart from the perpendicular in their course downward as to extend outside the vertical side lines of said surface location. But their right to the possession of such outside parts of such veins, lodes or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described through the end lines of their location so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges."

Respondent contended that the General Thomas No. 3 vein, as it enters the Chief of the Hill ground, runs crosswise to the General Thomas No. 3 location within planes drawn through its end lines.

The relative position of the claims and the strike of the General Thomas No. 3, as contended for by respondent, will be understood by reference to the diagram:

It was held in the *Flagstaff Case*, 98 U. S. 463, 25 L. Ed. 253, that under these provisions the location of a mining claim should be made lengthwise in the course of the vein.

"It was not the intent of the law," said the court, "to allow a person to make his location crosswise of a vein so that the side lines shall cross it, and thereby give him the right to follow the strike of the vein inside of his side lines. That would subvert the whole system sought to be established by the law. If he does locate his claim in that way, his right must be subordinated to the right of those who have property located on the lode. Their right to follow the dip outside of their side lines cannot be interfered with by him. His right to the lode only extends to so much of the lode as his claim crosses. If he has located crosswise of the lode, and his claim is only one hundred feet wide, that one hundred feet is all he has a right to. This we consider to be the law as to locations on lodes or veins." Applying these principles, the jury were, in effect, told that the easterly side lines of the General Thomas No. 3 claim was in fact its end line, and that appellant could not follow the strike of the ledge beyond that line. The subject of instruction was the ownership of the miner on the vein within his side lines, and could not have been mistaken, as appellant suggests, to the method by which work could be prosecuted within the limits of the claim either by upraising or drifting.

Respondent's instruction No. 8 was as follows:    "(8) If you find from the evidence that the defendant entered upon a ledge having its apex within the exterior boundaries of plaintiff's location, and extracted ore therefrom between the planes drawn vertically downward through the end lines of said location, the right of the plaintiff to recover damages for such acts would not be affected by proof merely that the place from which such ore was extracted could be reached by going continuously through ledge matter from a ledge having its apex within the exterior boundaries of a prior location belonging to the defendant. In order that such proof should avail the defendant, it must further appear that such passage from the apex of defendant's ledge is made continuously downward on the dip of that ledge; and, if any portion of such passage must necessarily be made either upward or laterally along the strike, then the plaintiff's right to recover is not affected." Appellant's evidence was to the effect that at a point called "Crowfoot" on the apex of the First Easterly

Extension of the Northern Belle a passage could be made in ore to the thirteenth level, and from thence in ore to the point from which the ore was taken. It was argued that these facts showed but one ledge. Respondent's evidence was that the Northern Belle and General Thomas No. 3 were separate ledges, but that they united somewhere below the eleventh and above the thirteenth level. Assuming that the ledges had so united, the fact that one ledge could be reached in ore or ledge matter from the other below the point of union does not prove they are one ledge above that point.

Respondent's instruction No. 3 was upon the subject of the measure of damages. The testimony of the secretary of defendant and appellant showed that net profits amounting to $60,000 have been paid in dividends to its stockholders, and the testimony of the superintendent showed that twenty-nine thirtieths of the ore extracted was taken from respondent's ground. The testimony of these officers was entirely undisputed. As the verdict was for $48,000, and under the most favorable rule respondent was entitled to recover $58,000, appellant could not have been prejudiced by the instruction.

Appellant requested the court to instruct the jury as follows: "(3) You are instructed that the Holmes Mining Company, the defendant in this action, is, and was at and before 1st day of May, 1884, the time of the alleged trespass, the owner, in the possession, and entitled to the possession of the Northern Belle claim, the First Easterly Extension of the Northern Belle, and the General Thomas No. 3 claim; and that each of said claims was located prior to the location of the Chief of the Hill claim, and that the defendant is now the owner in fee by United States patents of all of said claims, and that at all times prior to May 1, 1884, and ever since has been and now is the owner in the possession of all veins, lodes, and ledges of quartz, or other rock in place bearing gold and silver or other metals, throughout their entire depth, the top or apexes of which lie inside the surface boundary lines of said claims extended downward vertically, and also of the dips of such vein or veins, and all the ore of such veins on their dip, between planes extending through the end lines of such claims in their own direction."

The court modified the instruction by inserting after the words "and also of the dip of such vein or veins" the words "as pass through both end lines of each of said claims."

The requirement that the mineral veins should pass through both end lines is erroneous. It must be conceded, as decided in the *Del Monte Case*, 171 U. S. 67, 18 Sup. Ct. 895, 43 L. Ed. 72, that the miner has the right to follow his vein on its dip outside of his vertical side lines, whether the vein ever, in its course, reaches its end lines or not. The modification was immaterial to any issue, and could not have misled the jury. No question touching the right to follow the vein or the right to the possession of ore depended upon the qualification that the mineral deposit should pass through both end lines of a claim. The controlling question, and upon which the case was tried, was whether the General Thomas No. 3 and the Chief of the Hill were upon the same ledge. If they were not, plaintiff had no cause of action. This is shown by instruction No. 6, given at the request of appellant. It is as follows: "It is entirely immaterial what is the course or dip of any vein in the Northern Belle, First Easterly Extension, and General Thomas No. 3 claims, unless you believe from a preponderance of the evidence that the ore here in dispute was taken from the Chief of the Hill vein from the dip thereof."

Appellant produced the affidavits of two of the jurors tending to show that the jury agreed that each juror should write upon a separate slip of paper the amount of damages he desired to award plaintiff, and that the sum of the several estimates should be divided by 11, the number comprising the jury, and the quotient should be the amount of the verdict. Counter affidavits were filed, but the conclusion we have reached renders their consideration unnecessary.

At common law, affidavits of jurors could not be received to impeach their verdict, but could be admitted in its support. (*Rex* v. *Almun*, Bur. 2686; *Vaise* v. *Delaral*, 1 Term R. 11; *Owen* v. *Warburton*, 4 Ros. & Pul. 326; *Turner* v. *Tuolumne*, 25 Cal. 397; *Davis* v. *Taylor*, 2 Chitty, 268.)

In *Dalrymple* v. *Williams*, 63 N. Y. 361, 20 Am. Rep. 544, it is said: "There are reasons of public policy why jurors should not be heard to impeach their verdict, whether by

showing their mistakes or their misconduct. Neither can they properly be permitted to declare, with a view to affect their verdict, an intent different from that actually expressed by their verdict as rendered in open court. In early times the pains and penalties visited upon the jurors for false verdicts furnished an additional reason why they should not be allowed to impeach them. ( *Watts* v. *Brains*, Cro. Eliz. 778.) But the rule is well established, and at this day rests upon well-understood reasons of public policy as connected with the administration of justice, that the court will not receive the affidavits of jurymen to prove misconduct on their part, or any act done by them, which could tend to impeach or overthrow their verdict. This rule excludes affidavits to show mistake or error of the jurors in respect to the merits, or irregularity or misconduct, or that they mistook the effect of their verdict or intended something different."

"It is admitted, notwithstanding a few adjudications to the contrary, that it is now well settled, both in England, and, with the exception of Tennessee, perhaps in every state of this confederacy, that such affidavit cannot be received; and, we believe, upon correct reasoning. If it were otherwise, but few verdicts could stand. It would open the widest door for endless litigation, fraud, and perjury, and is condemned by the clearest principles of justice and public policy." (3 Graham & Waterman on New Trial, 1429.)

The following reasons are given by the same authors why affidavits of jurors should not be received: "(1) Because they would tend to defeat their own solemn acts under oath. (2) Because their admission would open a door to tamper with jurymen after they had given their verdict. (3) Because they would be the means, in the hands of the dissatisfied juror, to destroy a verdict at any time after he had assented to it." (Page 1428.)

In a learned note to *Crawford* v. *State*, 2 Yerg. 60, 24 Am. Dec. 467, the author says: "These reasons, considered in connection with the fact it has always been the policy of the law to keep the deliberations of jurors secret, and to allow jurors to arrive at their own conclusions without the fear of being afterwards compelled to disclose or to have disclosed the reasons upon which such conclusions were based, are

generally advanced by the latter cases to show that such affidavits should not be received." The common-law rule has been modified by statute in the State of California in this respect: "Whenever any one or more of the jurors shall have been induced to assent to any general or special verdict or to a finding by a resort to the determination of chance, such misconduct may be proven by the affidavits of any one or more of the jurors." (*Turner* v. *Tuolumne*, 25 Cal. 400.) South Dakota (*Murphy* v. *Murphy*, 47 N. W. 142, 9 L. R. A. 820), Idaho (*Flood* v. *McClure*, 32 Pac. 254), and Montana (*Gordon* v. *Trevarthan*, 13 Mont. 387, 34 Pac. 185, 40 Am. St. Rep. 452) have similar statutes. See, also, *Grinnell* v. *Phillips*, 1 Mass. 530; *Farrer* v. *State*, 2 Ohio St. 54. Aside from the Tennessee cases, contrary decisions can be found in Iowa (*Wright* v. *Illinois & M. Tel. Co.*, 20 Iowa, 195), and one in Kansas (*Perry* v. *Bailey*, 12 Kan. 539.)

Judgment and order affirmed.

Fitzgerald, J.: I dissent.

Talbot, J., concurring:

I wish to concur specially in the opinion of the Chief Justice in the important matters of practice relating to quotient verdicts and the inadmissibility of the affidavits of jurors under the circumstances existing in this case.

The affidavits of some of the jurors state that: "They all agreed that each one of said jurors should ballot by writing upon separate slips of paper the amount of damages he desired to award said plaintiff, and that, after said amounts should be so written and balloted, that said several amounts should be added together, and the total sum so arrived at should be divided by 11, the number of jurors constituting the jury, and that the amount so found and arrived at should control and fix the amount of the verdict to be awarded to and in favor of plaintiff."

Another juror makes affidavit: "That while it is true that such jurors all agreed that each one should ballot by writing upon separate slips of paper the amount of damages he desired to award said plaintiff, and that after said amount should be so written and balloted said several amounts should be added together, and the total sum so arrived at

divided by 11, the number of jurors constituting the jury, and that the amount so found and arrived at should control and fix the amount of the verdict to be awarded to and in favor of plaintiff, that, notwithstanding said agreement, and after said ballot had been so written and balloted and the sums added together and divided by 11, this affiant and each of the jurors in said case did freely and fully agree upon the verdict which was rendered in said case, and did fully and freely agree upon the amount to be awarded to said plaintiff, irrespective of said balloting, and did freely and fully agree and award said plaintiff the sum of $48,000."

Considering the sum allowed, $300 is a small variation, but sufficient to show that the jurors, and especially those who favored a lesser sum, were not entirely controlled or bound by the quotient which likely induced them to find for the nearest amount in even thousands. The jury had two important issues to determine. One related to the ownership of the ledge from which the ore was extracted, and under the conflicting testimony they, or the requisite number, must have found in favor of plaintiff; and after they arrived at this conclusion it became incumbent on them to determine the amount of damages which should be awarded against the defendant. One of the jurors put down nothing in making up the quotient. If this be considered unreasonably low, it was favorable to the defendant, and it cannot complain. But it was his privilege to find for the defendant under the conflicting evidence regarding the ownership of the ledge. A few cases hold without qualification that quotient verdicts should be set aside, but the better authorities sustain their validity, unless the jurors agree in advance to be bound by the amount.

Whether they so agree or not, no good reason appears to reject a quotient verdict if each juror puts down a sum within the issue, and supported by the evidence, which he conscientiously believes should be awarded. Some able opinions—such as that of Judge Sanderson, speaking for the court, in *Turner* v. *Tuolumne*—support these verdicts as being a mean and average of the amount of damages which the different jurors in their natural varying judgments believe should be awarded.

Other decisions are to the effect that such verdicts should

be vacated if the jurors so agreed in advance, because some juror might put down an extravagantly high or low amount. If admitted that the result of such a fraud when practiced by one and accepted by the other jurors should vitiate the verdict which it varies, when this fact or reason for such rule fails the rule itself should not apply, and in cases where such fraud is perpetrated, and it is shown that a juror put down an extravagant amount, the verdict should be set aside; but this would be no reason for vacating verdicts in other cases where no juror is guilty of such conduct, and where the verdict is an average of the different amounts which the several jurors honestly believe should be awarded. If the affidavits of jurors were to be considered at all, it would be only where the juror designates a sum designedly or unreasonably high or low, or where it is not within the issue or supported by the evidence, and this fraud or mistake is practiced or made by one of the jurors and allowed by the others to vary the quotient and amount returned, so it is not an average of the different estimates which, in the honest judgment of the respective jurors, should be allowed, that the verdict ought to be set aside. It is clear on elementary principles that, where no such conduct is shown to have taken place on the part of any juror, it should not be surmised or presumed by the court, and considered a ground for overturning the verdict, and that the party complaining must show injury and error. A number of decisions failed to make this distinction, but it is plainly drawn and the correct rule announced in *Lee v. Clute*, 10 Nev. 152, which controls and supports the verdict here, regardless of the admissibility of the affidavits of the jurors.

In *Birchard* v. *Booth*, 4 Wis. 71, each of the jurors marked down what he thought the damages ought to be, and these several sums were added up, and the amount divided by 12, and the jury could not agree upon the result as their verdict, and after further discussion the process was repeated, and they were still unable to agree upon such result, when it was proposed that the amount found by the first ballot, deducting $16, should be adopted as their verdict, and it was so agreed. The court held that such was not a gambling verdict, and should not be set aside for such cause. It was for $2,400.

To allow jurors who have taken an oath to try the case and render a verdict according to the evidence to make affidavit that they have returned one not in compliance with this duty, does not, as a general rule, at least, commend itself as the best practice. Not only would it encourage weak jurors, acting under influence or prejudice, to stultify themselves and their fellow jurors, but it would open the door for the powerful, overzealous, and unscrupulous to prolong litigation, and crush the weaker adversary, regardless of the merits and justice of the controversy, and entail more hardships than it would avoid.

As stated in *State* v. *Crutchley*, 19 Nev. 368, 12 Pac. 113, if there are any extreme cases which should be an exception, this is not one of them. If the affidavits were admissible, and there was a conflict in them regarding the manner in which the verdict was reached, a finding by the trial judge supporting his order denying the motion for a new trial will be presumed. In about two score of the states in this Union the common-law rule that affidavits of jurors will not be received to impeach their verdicts is recognized, and with few exceptions enforced, save when modified by statute. It is unnecessary to cite opinions so numerous, and running into the hundreds. Reference to many cases upholding the doctrine can be found in the note to *Houk* v. *Allen*, 11 L. R. A. 706, in Hayne on New Trial and Appeal, sec. 73, and 14 Ency. Pl. & Pr. p. 905. The rule was enforced in California when the practice act similar to ours prevailed there, and has been since and is now in cases not coming under the amendment to that document and later enacted as part of the code, which makes such affidavits admissible to show that the verdict was reached by a resort to chance. In comparison with the mass of cases supporting this principle, the exceptions are rare.

Regardless of the substantial reasons which may be given and have been advanced by courts and text writers for the rejection of the affidavits of jurors, and regardless of the views of this court as to the advisability of receiving them to show that the verdict was not reached in the manner they had sworn to render it, the fact that such affidavits were inadmissible under the common law, which by statutory

enactment is made the rule of decision in all the courts of this state, tends strongly, if not conclusively, against their admission. (Comp. Laws 1900, sec. 3095; *Clark* v. *Clark*, 17 Nev. 124, 28 Pac. 238; *Wuest* v. *Wuest*, 17 Nev. 217, 30 Pac. 886; *State* v. *Cronan*, 23 Nev. 437, 49 Pac. 41.) But this court long ago, in *State* v. *Stewart*, 9 Nev. 120, and *State* v. *Crutchley*, 19 Nev. 368, 12 Pac. 113; decided directly that such affidavits ought not to be received. If not permitted to introduce them, the losing party has some protection against an excessive verdict, for the trial judge will set it aside and order a new trial if he believes it to be against the weight of the evidence, and the appellate court will make the same order if there is no evidence to support it. The plaintiff's demand alleged in the complaint is $2,000,000. The secretary of the defendant testified that during a certain period which covered the operations in the disputed ground the defendant realized from ores amounts aggregating several hundred thousand dollars, and paid $60,000 in dividends, and it was stated on the argument and not denied that twenty-nine thirtieths of this ore was shown by the testimony of the superintendent of the defendant to have come from the vein which the jury found belonged to the plaintiff. It is apparent that the amount allowed by the verdict was too small, and too favorable for the defendant, and that for this reason the verdict should have been set aside on the application of the plaintiff, and ought not to be vacated on the motion of the defendant.

For the several reasons that the affidavits of the jurors ought not to be received to impeach their verdict under the former decisions of this court and the circumstances existing here; that the jury, after discussion, adopted a different amount than the quotient, and, if guided or influenced by the latter, it does not appear to be in excess of an average of the various amounts which the respective jurors in their individual honest judgments believed under the evidence should be awarded to the plaintiff; that if the affidavits of the jurors could be considered, and it were admitted that the verdict was for the exact amount of the quotient, and that the jurors in advance had agreed to be bound by it—it would still be a good verdict under the rule promulgated by this court in *Lee* v. *Clute*, as there is no showing and no pre-

sumption that any juror put down an amount beyond his honest judgment; and, further, that after the jury had found that the vein from which the ore was taken belonged to the plaintiff, it appears that the amount named in the verdict is too small, and too favorable to the defendant.

ON PETITION FOR REHEARING.

*Per Curiam:*

Rehearing denied.