[Civil No. 1963.  Filed September 14, 1922.]

[209 Pac. 283.]

# TOM REED GOLD MINES COMPANY, a Corporation, Appellant, v. UNITED EASTERN MINING COMPANY, a Corporation, Appellee.

1. MINES AND MINERALS—RIGHT OF OWNER OF MINING CLAIM TO GO OUTSIDE SURFACE BOUNDARIES STATED.—Under Revised Statutes of the United States, section 2322 (U. S. Comp. Stats., § 4618), relating to rights of locators of mining locations, the owner of any mining claim has the exclusive right of possession and enjoyment, not only of the surface included within the lines of the location, but the exclusive right of possession and enjoyment of all veins, lodes, and ledges throughout their entire depth, the tops or apices of which lie inside of such surface lines extended downward vertically, though such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side line planes of such locations within the ground beneath the surface lying between the vertical end line planes extended in the direction of the dip of such veins.

2. MINES AND MINERALS — VEIN MUST BE PURSUED ON ITS COURSE DOWNWARD.—No extralateral right exists to a vein, lode, or ledge beyond the point where, in its course outside the claim of apex, it becomes flattened and extends from thence horizontally in a departure from the approximate general plane of the vein in its downward course, or for any considerable distance takes an upward trend.

3. MINES AND MINERALS—VEIN TO WHICH EXTRALATERAL RIGHT ATTACHES MUST BE IDENTICAL WITH VEIN LYING WITHIN BOUNDARIES OF CLAIM.—A vein to which the extralateral right attaches must be an integral part of a vein or lode which apexes within the boundaries of a mining claim, and as such must be continuous, in the sense that it can be traced through the surrounding rocks.

4. APPEAL AND ERROR—IN ABSENCE OF REQUEST FOR COURT TO FIND FACTS, JUDGMENT AFFIRMED, IF SUPPORTED BY EVIDENCE.—Where no request was made by either party, in a case tried to the court, to find the facts in accordance with Civil Code of 1913, paragraph 528, the judgment must be affirmed, if supported by the evidence.

5. MINES AND MINERALS—ONE CLAIMING RIGHTS ANTERIOR TO ENTRY OF MINING CLAIM FOR PATENT NOT CONCLUDED BY PATENT, BUT

---

1. For authorities discussing the question of right to follow a vein or lode on its dip beyond the surface lines of the location, see notes in 58 Am. St. Rep. 263; 53 L. R. A. 491.

ENTITLED TO SHOW HIS PRIOR DISCOVERY.—One who claims rights anterior to the entry of a mining claim for patent, and dependent on the order of the facts making up the right to the land, is not concluded by the patent, but may show such order, including the fact of his own prior discovery of mineral.

6. MINES AND MINERALS—EVIDENCE HELD TO SUPPORT JUDGMENT OF BISECTED APEX OF SIDE LINE VEIN.—In an action between owners of adjoining mining claims to quiet title and establish extralateral rights to a vein apexing in plaintiff's claim, evidence *held* to support a judgment awarding defendant such portions of the side line vein as are bisected by the common side line of the claims, with extralateral rights.

7. MINES AND MINERALS—PLAINTIFF, IN SUIT TO QUIET TITLE TO VEIN OF MINERAL, HELD ENTITLED TO COSTS, WHERE JUDGMENT WAS PARTLY IN HIS FAVOR.—Where defendant, in action to quiet title to a vein of mineral, claimed title adverse to plaintiff, and the judgment was only partially in his favor, plaintiff was entitled to costs, under Civil Code of 1913, paragraph 1625.

APPEAL from a judgment of the Superior Court of the County of Mohave. E. Elmo Bollinger, Judge. Judgment modified and affirmed.

Mr. Wm. E. Colby and Mr. Louis L. Wallace, for Appellant.

Mr. John P. Gray, Mr. R. L. Alderman and Mr. C. W. Herndon, for Appellee.

FLANIGAN, J.—This action was brought by the appellant, Tom Reed Gold Mines Company, against the appellee, United Eastern Mining Company, to quiet title and establish extralateral rights to what appellant denominates the underground segment of a vein known as the Grey Eagle or Tom Reed vein, apexing in its Grey Eagle and Bald Eagle lode mining claims. The accompanying diagram (Plaintiff's Exhibit 20) shows the Grey Eagle vein, which traverses the Grey Eagle claim lengthwise, passing on its strike through the southerly end line of that claim into the Bald Eagle claim through its northerly end line. The Big Jim lode mining claim is the property of appellee. The diagrams from plaintiff's exhibits (sections 21 and 29) are of vertical cross-sections of the Grey Eagle and Big Jim claims, and show with sufficient

accuracy for the purposes of this opinion the location
of the Grey Eagle vein with relation to the deposits
to which the extralateral right is claimed.

EXHIBIT NO. 20

SECTION 21 (Looking Northwest)

SECTION 29 (Looking Northwest)

The physical features of the case are fairly set forth in the opening brief of appellant, from which we quote, with some elision, as follows:

"It is conceded that the apex of the Tom Reed vein extends through the Grey Eagle claim from end line to end line, this portion of the Tom Reed vein being described as the 'Grey Eagle' vein in the complaint, and is so labeled on certain of the exhibits. It was also conceded that the apex of the same vein was found crossing the common end line between the Grey and Bald Eagle claims, and that this apex continued on within the Bald Eagle claim for a distance sufficient to cover all the ore bodies in question in depth. In other words, there was sufficient length of apex of the Tom Reed vein conceded to exist within the Bald and Grey Eagle claims, so that, if extralateral rights attach to such apex, it would embrace all the ore bodies in controversy beneath the surface of the Big Jim claim.

"This situation will appear from the plat here inserted for illustrative purposes (Exhibit No. 20). The relative position of the Grey and Bald Eagle and Big Jim claims appears thereon. The apex of the Tom Reed vein is also shown in solid black. There is indicated in lighter hatched lines the position of the so-called Mallery fault where it comes to the surface, the significance of which constitutes one of the features of this case. The series of numbered parallel lines crossing the claims indicates the position of certain cross-section map exhibits introduced by the Tom Reed.

"The defendant did not seriously question any of these facts, except the width of the Tom Reed vein. The Tom Reed vein dips steeply in the direction of the Big Jim claim. The Mallery fault, on the other hand, dips steeply in the opposite direction, that is, toward the apex segment of the Tom Reed vein, and intersects and cuts off the Tom Reed vein in the vicinity of the 600 level of the Tom Reed workings. This fault is what is known as a normal fault; that is, the block of ground on the hanging wall side of the fault moved down with relation to the foot wall block, so that after the apex segment of the Tom Reed vein

was dislocated at the 600 level one has to proceed upward along the fault for a little over 400 feet before finding the main downward continuation of the Tom Reed vein. It is this dislocation which has given rise to this lawsuit; the Tom Reed Company contending that it is entitled to the faulted segment of the Tom Reed vein, and the United Eastern Company claiming that this faulting has been so great that it has destroyed the right to follow the Tom Reed vein beyond the fault.

"The faulting was not a single and simple feature, but the movement took place along different planes of breaking, so that there exists between the two main segments of the Tom Reed vein quite a considerable portion of the vein which the Tom Reed referred to throughout the trial as the 'intermediate' or 'second' segment; the apex segment being referred to by them as the 'apex' or 'first' segment, while the large faulted segment existing beneath the Big Jim surface was described by them as the 'third' segment. On the other hand, the United Eastern referred to the apex segment as the Tom Reed vein, the intermediate segment as the 'side line vein,' and the third segment as the 'Big Jim vein.' The existence of this intermediate segment between the other two segments reduces the magnitude of the faulting, or rather the distance which one has to follow along the fault before reaching faulted portions of the Tom Reed vein." This intermediate segment is found on section 21 "practically in conjunction or juxtaposition with the third segment, and continuing in a northerly direction along these various sections this intermediate segment is found progressively to have broken further and further away from the third segment, until in the northernmost sections (Tom Reed cross-sections 29–35), it is found to occupy an intermediate position, or a position practically halfway between the two main segments, so that the dislocation between the apex segment and the intermediate segment on the one hand, or the intermediate segment and the third segment on the other, is approximately the same distance, namely about 200 feet, or one-half the total amount of dislocation between the two main segments."

24 Ariz.—18

Concerning the distances separating the veins, we may remark that according to one of appellant's witnesses the Big Jim and Grey Eagle veins are nowhere closer than 350 feet. On one cross-section, the distance along the fault from the bottom of the Grey Eagle vein to the top of the Big Jim vein is 400 feet, and horizontally from the top of the Grey Eagle to the top of the Big Jim 350 feet; on another section, it is 420 feet from the bottom of the Grey Eagle to the top of the Big Jim vein, and the shortest distance between these veins is 345 feet; on another, the distance from the bottom of the one to the top of the other is 430 feet, and the horizontal distance 420 feet.

On the issues made by the complaint and the answer of the defendant, which included a cross-complaint, the case was tried before the court without a jury, and the court of its own motion made findings of fact and gave judgment for the appellee, quieting its title to the Big Jim vein and to such portions of the side line vein as apexed under the surface of the Big Jim claim, and the whole of such portions of this vein where the apex is bisected by the common side line, with appurtenant extralateral rights, and adjudged to the appellant such parts of the side line vein only, with extralateral rights, as apexed wholly within the ground of appellant. From these findings we quote the following:

"The court finds that within the premises in question there exist at this time three separate and distinct veins or ore bodies, namely, the Tom Reed vein, the side line vein, and the Big Jim vein. These veins are permanently separated, have been so separated for many centuries, and each of them possesses an individuality of its own. The only physical connection that they ever had in the past ages was that each of these veins or ore bodies at some time in the distant past constituted a part of one main fissure or vein system, which was disrupted by the Mallery fault. So far as the testimony in this case shows, it would be impossible for any geologist, either by pos-

itive knowledge or through the agency of geological projections, to locate the actual physical continuation of the Tom Reed vein. This same condition exists as to the Big Jim vein, with reference to the ore which at one time constituted the upward extension of this vein. The Tom Reed or Grey Eagle vein is wholly within the ground of the plaintiff, has its apex within the ground of the plaintiff, and is owned by the plaintiff. The Big Jim vein is wholly within the ground of the defendant, has its apex within the ground of the defendant, and is owned by the defendant. The side line vein is partly within the ground of the plaintiff and partly within the ground of the defendant, and part of its apex is within the ground of the plaintiff, a part is in the ground of defendant, and a part of its apex is bisected by the common side line of plaintiff and defendant. This vein is secondary or accidental in character, and is of minor importance in comparison with the other two veins in question. As Mr. Hershey very aptly remarked during his testimony, this ore body 'lagged behind' when the Mallery fault was formed. A part of this side line vein is owned by plaintiff, and a part of this vein is the property of the defendant. That part of the vein which has its apex wholly within the ground of the plaintiff is the property of the plaintiff. That part of the vein which has its apex wholly within the ground of the defendant, and where the apex is bisected by the common side line is the property of the defendant. The ore beneath the surface of the Big Jim claim cannot be reached by following the Tom Reed vein from its apex in the manner outlined and limited by section 2322 of the Federal Statutes. This section of the Federal Statutes is the legal authority and criterion for the exercise of extralateral rights. Furthermore, commencing anywhere on the dip of the Big Jim vein, if said vein were extended upward to the surface, the apex of this vein would still be entirely within the surface lines of the Big Jim claim. There are no ore bodies within either the Grey Eagle or Bald Eagle claims that may be followed in the manner outlined and limited by section 2322 of the Federal Statutes which would lead into and connect with the ore bodies which constitute the Big Jim vein. . . .

"The plaintiff introduced a great deal of convincing testimony as to identity. Among other things, it proved that the ore is abruptly cut off and exists on opposite sides of the Mallery fault, that the strike and dip of the various ore bodies are very similar, that the vein filling is virtually the same, that the wall rocks are similar, and that, on the hanging wall side of the Mallery fault the ore is bent upward while on the foot wall side of this fault it is bent downward. But the plaintiff did not identify the ore which is located beneath the surface of the Big Jim claim as the continuation of its vein known as the Tom Reed vein, which stops abruptly against the Mallery fault on the 600-foot level of the Grey Eagle and Bald Eagle claims. This identity and continuity of the Tom Reed vein within the plaintiff's ground into the ground of the defendant was not proven, and could not be proven, if for no other reason than because it would be impossible to ascertain the extent of the horizontal movement at the time of the formation of the Mallery fault."

From the evidence of the geologists the court below gave the following explanation of the formation of the veins in question:

"At some time in the past, when hot waters were percolating and circulating through the openings of the rocks, the early fault fissures of the Oatman district were mineralized, and when these faults became mineralized they then become what are known as veins. At some time later, when strain was developed in the rocks by other causes, there was a recurrence of faulting, and at this later time the movements dislocated and passed through the older fault, which had become mineralized. Because the faulting which created the Mallery fault occurred at a later time and at a time when the temperature was not high, mineralization did not take place, and, for that reason, what is known as the Mallery fault is simply a fault, instead of a vein. Therefore we have established in the Oatman district two fissure systems; the older system, which was mineralized, as exemplified by the Tom Reed vein, which traverses the Grey Eagle and Bald Eagle claims of the plaintiff, and the

later system, which is not mineralized, as exemplified by the Mallery fault."

The court further said:

"The court is of the unqualified opinion that at some time in the dim and distant past the ore bodies beneath the Tom Reed property and the ore bodies beneath the United Eastern property were once connected as a part and parcel of the same *general fissure and vein system,* but this court has no information as to just how many thousands or how many millions of years have elapsed since that condition existed, but that it at some time in the past did exist seems to be the opinion of all the expert witnesses on both sides. But when the faulting occurred as the result of the formation of the Mallery fault there was not only a downward displacement of approximately 430 feet, but there was a horizontal movement, the extent of which is not known, and the best proof which could be introduced as to the size of the horizontal component would be nothing more than a wild guess. For instance, there is nothing before this court that any part of the vein along the 600 level within either the Grey Eagle or Bald Eagle claims was ever attached to any part of the top of the vein as found at the 200 level within the surface of the Big Jim claim. About the only testimony on this point was to the effect that the horizontal movement was greater than the downward displacement."

The court held that the deposits constituted distinct, separate, and different veins at the present time, whatever their connection may have been as a part and parcel of the same general fissure and vein system in the prehistoric past, and that therefore the extralateral right claimed by the appellant because of its ownership of the surface ground, which included the apex of the Grey Eagle vein, to follow and mine the side line and Big Jim veins within the ground of appellee could not and did not exist. The following propositions were enunciated:

First. That appellant had not established its extralateral right, because it could not start on the apex

of the Grey Eagle vein, proceed on a course downward on its dip and practically within the plane thereof, and reach the ore body found within the Big Jim or side line deposits beneath the surface of the Big Jim claim.

Second. That neither identity nor practical continuity of the deposits as one vein was proved.

Third. There was no "continuity of right"; that is to say, the separated deposits could only be reached by working through the subsurface of the Big Jim claim, a right not possessed by appellant.

Following the order adopted by counsel in presenting the case, we shall first consider the claim of extralateral right to the Big Jim and side line veins, and afterwards take up certain questions raised as to the side line vein. Such right as the appellant may have to go outside of its surface boundaries on the dip of the Grey Eagle vein is conferred by section 2322 of the Revised Statutes of the United States (6 Fed. Stats. Ann., p. 523; U. S. Comp. Stats., § 4618), which reads as follows:

"The locators of all mining locations heretofore made or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim exists on the tenth day of May, eighteen hundred and seventy-two, so long as they comply with the laws of the United States, and with state, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between verti-

cal planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. And nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another."

The language above quoted confers upon the owner of any mining claim the exclusive right of possession and enjoyment, not only of the surface included within the lines of the location, but the exclusive right of possession and enjoyment of all veins, lodes, and ledges throughout their entire depth, the tops or apices of which lie inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side line planes of such locations, within the ground beneath the surface lying between the vertical end line planes extended in the direction of the dip of such veins.

The authorities construing this section hold (1) that the vein to which this extralateral right is claimed must be followed on its "course downward"; and (2) that the right attaches only to the identical vein which has its apex within the location, and not to another and different vein lying outside the vertical boundaries of the claim. Both these conditions must exist, and are independently essential to the right of extralateral possession and enjoyment. We treat of them in order:

(1) The vein must be pursued on its course downward.

In *Stewart M. Co.* v. *Ontario M. Co.*, 23 Idaho, 724, 132 Pac. 787, it was said:

"Sometimes it may happen that the 'downward course' of a vein will be perpendicular, and the vein

will form a vertical plane, but, as a rule, there is a deflection in the downward course of these mineral veins from the perpendicular, and we call this their dip; but still the course of the dip is always 'downward,' and, when the plane of the vein reaches the horizontal, then we have a blanket vein or lode, and on such a vein a locator has no extralateral right. . . . The Supreme Court always qualifies its holdings in this respect by the condition of the statute that the course between those vertical planes must be downward."

In *Southern Nevada G. & S. M. Co.* v. *Holmes M. Co.*, 27 Nev. 107, 103 Am. St. Rep. 759, 73 Pac. 759, it was held:

"If the defendant entered upon a ledge having its apex within the exterior boundaries of plaintiff's location, and extracted ore therefrom between the planes drawn vertically downward through the end lines of said location, the right of the plaintiff to recover damages for such acts would not be affected by proof merely that the place from which such ore was extracted could be reached by going continuously through ledge matter from a ledge having its apex within the exterior boundaries of a prior location belonging to the defendant, but it must further appear that such passage from the apex of defendant's ledge is made continuously downward on the dip of that ledge, and if any portion of such passage must necessarily be made either upward, or laterally along the strike, then the plaintiff's right to recover is not affected."

See Lindley on Mines, 3d ed., §§ 319 and 589, and *St. Louis M. Co.* v. *Montana M. Co.*, 113 Fed. 900, 64 L. R. A. 207, 51 C. C. A. 530; Id., 194 U. S. 235, 48 L. Ed. 953, 24 Sup. Ct. Rep. 654 (see, also, Rose's U. S. Notes).

While the authorities which have passed upon the question are but few in number, there would seem to be no reason to doubt that the excerpts we have quoted state the true rule, which is that no extralateral right exists to a vein, lode or ledge beyond the point where

in its course outside the claim of apex it becomes flattened and extends from thence horizontally in a departure from the approximate general plane of the vein in its downward course, or for any considerable distance takes an upward trend. Appellant does not, indeed, contend that the extralateral right is not so conditioned, and gives lip service, at least, to the rule in the following language, which we quote from its brief:

"There is nothing contained in this [the statutory language] which in any way militates against the right of an individual to follow upward along a fault or other barren material in order to reach a faulted edge of his vein so that he may continue mining on that vein in its course downward. In following these several faulted segments, nowhere is the miner mining *upward on the vein.* At every point he is following *the vein* as it exists on the various segments on its downward course."

It seems very plain that this contention perverts the language, meaning, and reason of the rule. It is not necessary, however, that we elaborate further here on the question. The contention so made is in fallacy intimately correlated with a much broader and even more untenable claim made by appellant, of which we shall speak later.

(2) The vein to which the extralateral right is claimed must be the same vein, and in order to be such it must be practically continuous in its downward extension.

The best statements and expositions of this rule that can possibly be given are found in the language of the courts which have passed upon the question, which include the clear and preceptial utterances of juridical masters of our mining law. In *Cheesman* v. *Shreeve* (C. C.), 40 Fed. 787, at page 793, the following language is used by Judge PHILIPS:

"In general, it may be said that a vein or lode is a body of mineral or of mineralized rock in place, within

defined boundaries, in the general mass of the mountain. The vein which the miner pursues from its outcrop must, of course, be the same which he pursues outside of his side lines. Such vein need not, however, be a straight line, of uniform dip or thickness, or richness of mineral matter, throughout its course and length. Generally speaking, veins are found, when the mineral is extracted, in what constitutes clefts or fissures in surrounding walls, with a well-defined or traceable hanging wall, or roof above and foot wall below, of different kinds of rock. So long as the inclosing walls can be continually traced, and like mineral matter found therein, no doubt can exist that it is the same vein; but sometimes these clefts diminish so as to be scarcely perceptible, and, again, for a short distance, these fissures disappear to the eye and touch of the explorer, and then, a little further on, on the same plane, they are found again; and there may be spots or short spaces where the overhanging wall and the under-floor rock exist while the mineral deposit is not present, but on following the fissure or trend it reappears very soon. The jury will be sufficiently guided in such instances by keeping in mind that the vein or lode must be continuous only in the sense that it can be traced by the miner through the surrounding rocks; that is, slight interruptions of the mineral-bearing rock are not alone sufficient to destroy the identity of a vein; nor would a short, partial closure of the fissure have the effect to destroy the continuity of a vein, if, a little further on, it appeared or recurred again, with mineral-bearing rock in it. Where both mineral and fissure close, come to an end, and are not found again in that direction, or, if found at all, are so far off from the tracing of the vein, or so diverted from its original trend or line, or appear under different geological conditions and surroundings, the jury would be warranted in finding that the continuity was broken, and that the lode, therefore, was not the same; but, where well-defined boundaries, characterized by a generally uniform hanging wall and floor, and extending on a like general plane or dip, exist, slight evidence of ore may establish the existence of a lode.''

In *Iron Silver Mining Co.* v. *Cheesman*, 116 U. S. 529, 29 L. Ed. 712, 6 Sup. Ct. Rep. 481 (see, also, Rose's U. S. Notes), the court, speaking through Justice MILLER, uses the following language:

"Certainly the lode or vein must be continuous in the sense that it can be traced through the surrounding rocks, though slight interruptions of the mineral-bearing rock would not be alone sufficient to destroy the identity of the vein. Nor would a short partial closure of the fissure have that effect if a little farther on it occurred again with mineral-bearing rock within it."

In *Hyman* v. *Wheeler* (C. C.), 29 Fed. 347, Judge HALLETT, instructed the jury that:

"A body of mineral or mineral-bearing rock, in the general mass of the mountain, so far as it may continue unbroken, and without interruption, may be regarded as a lode, whatever the boundaries may be."

Further:

"In that view of the evidence, it may be important to consider and determine whether there is a fissure exposed in the several openings of the mine as asserted by the plaintiff; and, if you find that such fissure exists, whether it is practically continuous and unbroken between strata of blue and brown lime from an outcrop in the Durant claim to the Emma ground below. With such a fissure extending in that way, even if it be narrow, and carry ore only slight in quantity, and at considerable intervals, the case of the plaintiff may be regarded as established."

In *Iron Silver M. Co.* v. *Murphy* (D. C.), 3 Fed. 368, the same judge said:

"But I draw your attention to that theory, and say to you that if the vein or lode was formed in the way supposed, in connection with a much larger extent of the same matter, and this part, detached from another, was brought into its present position by some movement of the country, occurring after the lode was deposited, that circumstance will give it unity and individuality as distinguishing it from every part

to the west of it. And, if that theory be correct, the occurrence of ore or gangue on the western face of the limestone is not material, for the uplifted part lying on the upper face or plane of the limestone to the eastward, having been detached from the mass of which it was originally a part, gains by that circumstance a new end or terminal point, by which it may be held. In that view the fissure, if any, on the western face of the limestone, occurring after the other in point of time, has a distinct character of its own, and if it carries ore may be taken and held as a distinct lode."

In *Stevens* v. *Williams,* Fed. Cas. No. 13,413, 1 McCrary, 480, 1 Morr. Min. Rep. 586, Judge MILLER thus states the law:

"I say to you, further, that a total interruption of the ore matter, if the contact remains on each side, the limestone and porphyry are still preserved, and the vein of mineral matter is found within a short distance further on, pursuing that same contact, it is still a part of the same vein. In short, if there is a general and pervading continuance of this mineral matter with a casual and occasional interruption, but pursuing the same general course, bounded by the same rocky material above and below as far as you can trace that until it breaks off totally and is interrupted for a very large distance, it is a vein of rock or mineral matter."

See, also, *Butte & B. Min. Co.* v. *Société Anonyme Des Mines,* 23 Mont. 177, 75 Am. St. Rep. 505, 58 Pac. 111, and *Anaconda Copper M. Co.* v. *Pilot Butte M. Co.,* 52 Mont. 165, 156 Pac. 409.

These authorities establish the propositions that the terms, "vein," "lode," or "ledge" import *ex vi termini* an unbroken and uninterrupted continuance of a body of mineral or mineral-bearing rock; that the deposits to which the extralateral right exists must be an integral part of a vein or lode which apexes within the boundaries of the claim and as such is practically continuous and unbroken (*Hyman* v. *Wheeler, supra*); that the lode must be continuous in

the sense that it can be traced through the surrounding rocks, and while merely slight interruptions of the vein are not sufficient to destroy its identity, nor would short partial closure of the fissure have the effect to destroy its continuity, if it appear or recur again a little further on, such continuity is broken and the lode is not the same, either where the mineral and fissure close and come to an end, and are not found again in that direction, or, if found at all, are far off from the tracing of the vein, or much diverted from its original trend or line, or it appears under different geological conditions and surroundings (*Cheesman* v. *Shreeve, supra*), or where the vein breaks off totally and is interrupted for a very great distance (*Stevens* v. *Williams, supra*).

These authorities further indisputably establish that in determining whether identity exists the distances separating the deposits claimed to be one vein, as well as the direction and continuity of the vein in the general plane of its dip and course downward, are elements of the highest significance and importance. The main contention made by appellant on the trial, reiterated and relied upon in the argument before this court, and the maintenance of which is essential to appellant's success in establishing its claim to extralateral right, entirely disregards and ignores these fundamental principles. In the opening statement made for appellant in the court below by the learned and distinguished jurist, Honorable CURTIS H. LINDLEY (who since the trial has departed this life), it was said:

"Our basic and fundamental contention is that this [the separated deposits], under the authority of the law, is one vein, originally identical, the faulted parts being connected by *indicia* which, in our judgment, cannot be controverted. . . . I shall hope and expect through the medium of this case to establish a rule for the guidance of the mining world in the future, and that rule is this: That wherever a vein is faulted,

and the faulted segments can be identified and traced by absolute physical facts, and the faulted fragments are found within the end-line planes of the ground holding the apex, that in the authority of the law the miner is just as much entitled to go and take those segments which, through no fault of his, but through the acts and processes of nature have been separated in parts, and mine them and extract them, notwithstanding the fact that they are under his neighbor's surface. You may conceive by the process of *reducio ad absurdum,* if you please, a horizontal faulting to a limitable extent, but you cannot prove the rule by any such method as that, simply because the farther you go the more the forces of nature destroy the evidences. . . . You may take a vein that has faulted a long distance and by reason of the character of the enclosing rocks you may match them up with something a very long distance away. Of course, the longer the distance, the greater the difficulty of establishing the original identity from observable and visible facts, but nature, in its processes, leaves, as a rule, a rather safe guide by which to determine whether, as a matter of fact, they were originally parts of the same vein, and then the courts determine, with these facts once found, what are the relative liabilities, responsibilities, and rights of the respective parties.''

Consonant with this theory the witness Walter H. Wiley, a mining engineer testifying for appellant, said that in his judgment, where proof of original identity could be made, the magnitude of the faulting, even though it extended to a distance as great as 1,000 feet, would, in his judgment, still leave the original surface outcrop the apex of the vein. And the witness, Dr. Andrew C. Lawson, in his examination as a witness for appellant, testified that in his opinion as a geologist the amount of displacement of a vein by faulting would not affect the identity of the original vein, and that this was true, even though the surface of these claims had been eroded to the level of the apex of the Big Jim lode.

The rule thus contended for, in short, is that, if the owner of a vein apexing within the surface bound-

aries of his claim can show that somewhere "in the
dark backward and abysm of time" the vein by a
movement of the earth's crust was severed and carried
away from the lode of which it was then a component
part and formed the top or apex, the faulted segment
or segments from which it was so severed may be
followed and mined wherever the same may be found
within the parallel end-line planes projected in their
own direction with the dip of the vein, no matter how
far these fragments may have been separated by the
displacement, and without regard to the fact that the
vein comes to an abrupt end against a fault, and is
no longer to be found in that direction. The only
difficulty recognized by counsel to the sustaining of
this floating extralimital grant was the proof of
original identity of the separated "segments."

Counsel for appellee have pursued this theory of
the law to some of its consequences by illustrating
its practical application to various supposable physi-
cal conditions. That the rule contended for is un-
conscionable, and fraught with great possibilities of
injustice and arbitrary deprivation of the right of the
discoverer of mineral upon the public domain to that
which he discovers, may easily be demonstrated, and
the subject is inviting. The discussion from that
viewpoint, however, would unduly lengthen this opin-
ion without commensurating advantages. Examples
drawn from the inconvenience and unreason of the
rule avouched strengthen the argument by broadening
the basis of induction to the wisdom of the law: but
the argument from authority is sufficient, and in this
case conclusive against appellant's contention.

We agree with the court below that no exigency ap-
pears which requires the decision to be found upon
"conditions as they existed thousands or millions of
years ago," and that the rules to be applied are con-
cerned with "conditions on the ground to-day," and
that—

"If veins are separated permanently, and cannot be followed as the same vein, and if it is necessary to pass through great distances of country rock in order to connect them, in which distances there are neither mineralized walls nor seams, such veins must be deemed separate and distinct ones, and cannot be identified as one and the same."

We shall add but the observation that the original identity of the veins which appellant on its own theory of the case conceded it must prove was not shown to the satisfaction of the court below, which found that—

"Identity and continuity of the Tom Reed vein within the plaintiff's ground into the ground of the defendant was not proven, and could not be proven, if for no other reason than because it would be impossible to ascertain the extent of the horizontal movement at the time of the formation of the Mallery fault."

And also:

"There is nothing before this court to show that any part of the vein along the 600 level within either the Grey Eagle or Bald Eagle claims was ever attached to any part of the top of the vein as found at the 200 level within the surface of the Big Jim claim. About the only testimony on this point was to the effect that the horizontal movement was greater than the downward displacement."

Now, the rule as tersely stated by Judge HAWLEY in *Con. Wyoming Gold M. Co.* v. *Champion M. Co.,* 63 Fed. 540–550, is unquestionably:

"Hands off of any and everything within my surface lines extending vertically downward, until you prove that you are working upon and following a vein which has its apex within your surface claim, of which you are the owner"

—a concession frankly made by Judge LINDLEY in his opening statement:

"It is customary to say that, where you invade the surface of another man's land, you must show by a

preponderance of the evidence that you are following the vein dip, the apex of which is within your ground, and the burden of proof rests upon the apex claimant to justify his position underneath the neighbor's surface, and we very frankly concede, and have so stated on many occasions, that the burden of proof rests on us to establish the identity in law of these separate fragments, our right to explore the barren country rock in search of the lost fragment, and our right to follow these fragments with the same degree as if they were in their normal condition, a part and parcel of the original land.''

As the horizontal component of the movement along the fault planes could not be shown, it is evident that within the extension of the end-line planes of the Grey Eagle and Bald Eagle claims, respectively, the appellant could not make the proof of original  identity upon which to predicate the right ''to follow these fragments with the same degree as if they were in their normal condition a part and parcel of the original land.''

Appellant cites and strongly relies upon the decisions in the *Original Sixteen to One Mining Case* (D. C.), 254 Fed. 630; Id. (C. C. A.) 260 Fed. 724. In that case, which involved a claim of extralateral right, it was conceded that a vein existed in the Sixteen to One claim; that this vein dipped in an easterly direction at an angle of forty-five or fifty degrees, and terminated at a fault at about the 200-foot level; that by dropping down a distance of fifteen or twenty feet at the shaft, and a distance of thirty-five or forty feet at the northerly boundary of the claim, another vein is picked up, likewise terminating at a fault.  Witnesses for the plaintiff testified that the two segments were one and the same vein, and witnesses for the defendant testified to the contrary.  Upon the evidence, the jury and the court decided that the lower vein was a continuation of the upper one, and the finding was upheld.  From this statement it appears

that the distance separating the two segments of the vein was inconsiderable as compared with the distance of separation in the case at bar, and that, furthermore, the vein was found in substantially the same plane by dropping down the distance mentioned. It seems to us that the really significant feature of that case with relation to the case here is that both courts treated the question as one of fact, adverting to the conflicting testimony of geologists, mining engineers, and practical mining men on the question of identity; the implication being very strong that, had a finding been made that the segments were distinct veins, the holding to that effect would have been supported by the evidence. In the case at bar much testimony was introduced on behalf of the appellee by geologists and men of practical experience in mining, mining engineers, and operators that the three deposits were separate and distinct veins, whether considered from a geological standpoint or from the standpoint of a practical miner, and the court found this to be the fact.

We have adverted to the holding of the court that the appellant must fail, because section 2322, Revised Statutes of the United States, does not invest it with any right of general exploration under the subsurface of the claim of appellee. The case of *St. Louis Mining & Milling Co.* v. *Montana Mining Co.*, 194 U. S. 235, 48 L. Ed. 953, 24 Sup. Ct. Rep. 654 (see, also, Rose's U. S. Notes) (see same case in the Circuit Court of Appeals, 113 Fed. 900, 64 L. R. A. 207, 51 C. C. A. 530), forecloses all argument on this head. It was held by the Supreme Court, affirming the ruling of the Circuit Court of Appeals, that the right of the owner of a vein apexing within the surface boundaries of his claim to follow and mine the vein on its dip downward outside the vertical side lines thereof did not include the right to run a horizontal tunnel from his claim into an adjoining patented lode claim for

the purpose of reaching the vein in its descent through such adjoining claim. The Supreme Court, through Justice BREWER, likened the situation to that presented by the lines of a right-angled triangle, the vein descending on its dip being the hypothenuse, the tunnel the base line and the boundary between the two claims the altitude of the triangle. (See pictorial illustration, Figure 42a, Lindley on Mines, 3d ed., § 490a.) The court held that the patent to a mining claim conveys the subsurface as well as the surface, and that so far as was disclosed by the case the only limitation on the exclusive title thus conveyed is the right given to pursue the vein which on its dip enters the subsurface. Referring to the language of section 2322 of the Revised Statutes of the United States granting the extralateral right in its limitation upon the full extent of the rights granted by the patent to the servient claim, the court said:

"But this limitation operates only indirectly, and by virtue of the grant to another locator to pursue a vein apexing within his surface boundaries on its dip downward through some sideline into the ground embraced within the patent. It withdraws from the grant made by the patent only such veins as others own and have a right to pursue."

In the course of the opinion the court quotes with approval from 2 Lindley on Mines, second edition, section 780, as follows:

"*Prima facie,* such a patent confers the right to everything found within vertical planes drawn through the surface boundaries; but these boundaries may be invaded by an outside lode locator holding the apex of a vein under a regular valid location, in the pursuit of his vein on its downward course underneath the patented surface."

In the Circuit Court of Appeals the following language was used by GILBERT, Circuit Judge:

"What are the rights that are given by the patent to the owners of the St. Louis claim? They are given

the right of possession of the surface and of everything within their own claim, except the veins or lodes therein, which may have their apices in the surface of another claim, so as to give the owner of the latter extralateral rights, and they are given the right to follow outside of their side lines and into adjoining claims all veins or lodes which have their apices in their own claims, so as to confer extralateral rights. This is their right, and no more. There is no warrant for saying that they have any general right of exploration within land of an adjoining patented claim, whether upon or below the surface. The right of exploration is given for the purpose of making discovery of mineral. Of what avail would be the right of exploration if no benefit could be obtained from discovery made thereby? The ground covered by a subsisting, valid mineral location is open to exploration only by the owner thereof. The statute gives the appellants the right to follow the vein which they were seeking to reach by the tunnel, but it confers upon them no right to approach it from any point other than from the vein or lode itself. The mining laws, as we construe them, grant to a mineral locator more than the mere right to the surface of his claim and to the veins or lodes which have their apices therein. The statute (section 2319) declares 'the lands' in which valuable mineral deposits are found to be open to occupation and purchase; and section 2325 provides that 'a patent for any land claimed and located for valuable deposits may be obtained in the following manner.' These provisions tend to indicate that the patent when issued is a grant of land with all the rights incident to common-law ownership. The reason for specifying in the description of the grant the 'veins, lodes, and ledges' is for the purpose of defining what is granted in addition to the land, namely, the right to pursue such veins, lodes, and ledges extralaterally in case they depart from the perpendicular and extend beyond the side lines of the claim. This view is in accord with the trend of all the decisions to which our attention has been directed.''

See, also, *Anaconda Copper M. Co.* v. *Pilot Butte M. Co.,* 52 Mont. 165, 156 Pac. 409; *Duggan* v. *Davey,* 4 Dak. 110, 26 N. W. 887–890.

It will be noted that the federal decisions were adverse to the right of the owner of a vein actually apexing within his surface boundaries to reach the vein, to which he possessed the undoubted extralateral right, by means of the proposed tunnel. In the case at bar, therefore, if it could be assumed that the ownership by appellant of the Grey Eagle vein invested it with the extralateral right to the Big Jim and side line deposits, the right to possess and enjoy them cannot be exercised in the manner claimed.

We conclude on this branch of the case that the findings of the court are amply warranted by the facts in evidence and that the appellant has shown no right to the separated veins, first, because they cannot be reached by a pursuit of the Grey Eagle vein on its course in the approximate plane of that vein extended downward; second, because these deposits are in fact distinct, separate, and different veins; third, as in any event the rights claimed may be enjoyed only by an invasion of appellee's subsurface the right itself cannot, under such facts, exist.

This disposes of the claim of extralateral right, by reason of the ownership of the Grey Eagle vein, to pursue and mine the Big Jim and side line veins. We now take up certain special questions raised by the decision of the court with reference to the division of the side line vein.

As noted, the judgment awards appellee such portions of the side line vein as are bisected by the common side line of the Grey Eagle and Big Jim claims, with appurtenant extralateral rights. The extension of this vein south of the Grey Eagle claim lies entirely within the boundaries of the Bald Eagle, and no question arises as to the ownership of that portion of the vein. The court did not set forth in its findings the facts from which it deduced the conclusion of ownership by appellee of the bisected apex. No request was made by either party, however, to find

the facts in accordance with paragraph 528 of the Civil Code, Revised Statutes of Arizona of 1913, and the findings made were on the Court's own motion. In the absence of such request, the rule undoubtedly is that the judgment must be upheld, if supported by the evidence. *Miles* v. *Franz Lumber Co.,* 14 Ariz. 455, 130 Pac. 1112. Whether it is so supported we now investigate.

The law is settled that, where two or more mining claims longitudinally bisect or divide the apex of a vein, the senior claim takes the entire width of the vein on its dip, if it is in other respects so located as to give a right to pursue the vein downward outside of the side lines. *Lawson* v. *U. S. M. Co.,* 207 U. S. 1, 52 L. Ed. 65, 28 Sup. Ct. Rep. 15 (see, also, Rose's U. S. Notes); *Star Mining Co.* v. *Federal M. & S. Co.* (C. C. A.), 265 Fed. 881. It is also held in the Lawson case that, in the absence from the record of an adverse suit, there is no presumption from the issuance of the patent that anything was considered or determined except the question of the right to the surface, and that the priority of right to the single broad vein which is vested in the discoverer is not determined by the dates of the entries or patents of the respective claims and priority of discovery may be shown by testimony other than the entries and patents.

In *Creede & C. C. M. & M. Co.* v. *Uinta T. M. & T. Co.,* 196 U. S. 337, 49 L. Ed. 501, 25 Sup. Ct. Rep. 266, it is held that the entry of a lode mining claim sustained by a patent, though conclusive evidence that at the time of entry there had been a valid location, does not preclude the owner of a tunnel site who claims that his location was prior to any discovery of the lode claimed from showing the order of the steps taken to perfect the lode location, including the date of discovery, notwithstanding the provisions of section 2320 of the Revised Statutes of the United States,

that ''no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located,'' which means nothing more than that no location shall be considered complete until there has been a discovery.

One who claims rights anterior to the entry of a mining claim for patent and dependent upon the order of the facts making up the right to the land is not concluded by the patent, but may show such order, including the fact of his own prior discovery of mineral. Cases *supra*, and *Kahn* v. *Old Tel. M. Co.*, 2 Utah, 174–188; 11 Morrison's Mining Reports, 645; *Last Chance Mining Co.* v. *Tyler Mining Co.*, 61 Fed. 557, 566, 9 C. C. A. 613; *Hickey* v. *Anaconda C. M. Co.*, 33 Mont. 46, 81 Pac. 806; *Butte & S. Co.* v. *Clark Mont. Realty Co.*, 249 U. S. 12, 63 L. Ed. 447, 39 Sup. Ct. Rep. 231 (see, also, Rose's U. S. Notes, Supp.); Lindley on Mines, 3d ed., § 783.

The record here shows no adverse suits covering the claim, and it is not denied that the end lines of the Big Jim claim are parallel, so as to confer upon its owner the right to pursue the vein downward outside of its side lines. Under these authorities, then, if the evidence fairly shows the fact of discovery of mineral within the Big Jim claim prior to the discovery of mineral within the limits of the Grey Eagle claim, the judgment of the court in the respect mentioned must be upheld. We think the evidence quite sufficient in that regard. We summarize:

Both the Grey Eagle and Big Jim claims are held under patents from the United States; the Grey Eagle patent having been issued on October 31, 1917, and the entry of the ground for patent having been made about June or July of 1915. The Grey Eagle claim was originally located January 1, 1904, and an amended location thereof made January 10, 1909. The Big Jim was located September 2, 1908. It is admitted by appellant in its pleadings that the Big

Jim claim was located in compliance with law on the date mentioned, and that the locators thereof discovered within the boundaries of said claim a vein or lode of mineral-bearing rock in place. Mr. Hilty, the locator of the Grey Eagle and Bald Eagle claims, testified that when he located them he "considered the value of the ground"; that he found values on both these claims on the surface; that two dollars was the highest value he found on either claim, and that he found mineral, or rock, which he considered to be in place, and this mineral was likewise at the discovery hole where the work was done. There was some corroboration of this testimony to the effect that the vein outcropped, so that it could be observed at the surface within a few feet of the original discovery shaft on the Grey Eagle.

On the other hand, it is not disputed that the original discovery shaft was not sunk on the Grey Eagle vein. An inspection of appellant's own exhibits shows this shaft to be some distance north of the vein itself. Mr. Haff, who surveyed the claim for patent in June and July of 1915, testified that at that time there were three holes on the Grey Eagle claim; one at the original discovery shaft, four feet by six feet, and in depth approximately eight feet; that no vein showed in this shaft. The other shafts were one forty feet in depth near the northern side line, and the other, also near the same side line, about ten feet in depth, neither of which showed vein matter. The amended location notice at that time was posted in a stone monument in the center line of the claim and some distance east of the original discovery shaft, and further away from the Grey Eagle vein. A shaft was later sunk at this point, and is referred to in the testimony as the new discovery shaft, or discovery shaft for patent. It is not claimed that mineral was uncovered in it, nor is it claimed that any shaft, except the Hooper shaft later referred to, went down

on the Grey Eagle vein. The testimony of Mr. Haff as to the lack of mineral showing or the discovery of a lode is borne out by the testimony of other witnesses. Mr. Searls testified that the original discovery shaft showed no vein, and that the Grey Eagle vein was not very apparent on the surface. Portions of the apex, at least, were covered with wash. Mr. Harrison testified as follows:

" . . . A. It may seem that a person should be able to find the outcrop of the vein, if there is a vein lying below the Grey Eagle, where we should find the outcrop of what would be the faulted segment of what was the Grey Eagle, but I think it is exceedingly difficult in Oatman to find the outcrop of a good many veins. The Grey Eagle vein outcrops at the surface below the wash.

"Q. By that you mean, underneath the wash? A. In some places the wash is quite deep. It varies. You cannot tell by walking over the wash. The top of the wash is above the solid rock. Now, Hilty's discovery shaft did not discover a vein. There is not any vein in the shaft. Going over the surface of the Grey Eagle from one end to the other, unless there were trenches and pits or places there that show where the vein has its outcrop, I do not believe that anybody would ever find that vein, not by just going over the surface."

Mr. Keating testified to the effect that the original discovery shaft showed no vein; that it was in country rock, with possibly a few little seams running through it.

This testimony is very strongly corroborated by the conduct of the appellant itself with reference to the development of the vein, from which it is hardly possible to infer discovery of the Grey Eagle vein as having occurred at any time prior to the presumptive discovery thereof at the date of entry for patent.

The Big Jim lode was developed by means of a shaft which uncovered the vein on Christmas Eve of 1915. At that time no work whatever had been done

upon the Grey Eagle vein, and no work of any kind on the Grey Eagle claim itself, except the three shafts mentioned; i. e., the original discovery shaft and the two shafts near the northerly side line of the claim. After the discovery of the Big Jim vein, however, the testimony shows that the appellant became immediately interested to discover its apex within the limits of the Grey Eagle claim, and to that end, after making inquiries as to the trend of the lode, began on March 15, 1916, to sink within the limits of the Grey Eagle claim a shaft which it was hoped would cut this lode. This, known as the Grey Eagle shaft did not go down on the Grey Eagle vein, but was sunk approximately 140 feet from the northerly side line, and approximately 240 feet distant from the Grey Eagle vein itself. The testimony of Mr. Keating, the engineer who developed the Big Jim lode, concerning this Grey Eagle shaft, is as follows:

"A. This shaft was sunk to about or possibly below the 200 level, and then they started to cross-cut to the line, and when the cross-cut reached the line the work was stopped. On May 1st the management of the Tom Reed changed hands, and immediately upon the new manager taking hold they continued the work on the cross-cut and cross-cut into the Big Jim ground.

"Q. Did you object to it and protest against it? A. We protested as strong as we could. I sent word to Los Angeles to ask them to have the work stopped, and I visited the office there and tried to stop it there; but, although they assured us that they did not want to do anything antagonistic to us, they still went ahead with their work.

"Q. What did you do then? A. I saw then that my best possible course was to stop the work by connecting with their workings, so some time in June I started an upraise from our 400-foot level to connect with their workings and put in a door and drive them out.

"Q. Did you do it? A. I did it as fast as I could.

"Q. Did you make such connection? A. We made such a connection about September, and I put in there a bulkhead and drove them off.

"Q. 3055, is that the one? On Exhibit 15? A. I presume that is the one. It is the only upraise on the 400 level of the Big Jim vein.

"Q. You put a door in there at the line, did you? A. I did.

"Q. What else was done by them at that time, if you know? A. They did some drifting and sunk the shaft deeper, intermittently; that is, they would work first in one place and then in another, and I remember at one time they got frightened and filled their shaft up from the 300 level to the 200 level.

"Q. With waste? A. With waste rock."

The first work on the Grey Eagle vein itself was in August, 1916, when the appellant started what is called the Hooper shaft. From this testimony it is to be deduced that the owners of the Grey Eagle claim did not think it worth developing, except by compulsory annual assessment work, not done on the Grey Eagle vein, and quite obviously not designed to develop that vein, until after the discovery of the Big Jim lode, at which time they considered their resources better expended in endeavoring to find the apex of that lode than in the development of the Grey Eagle vein itself. That they were unaware of the existence of the Grey Eagle vein at any time prior to the location of the Big Jim in September, 1908, is a fact well supported by the testimony summarized, with the fair inferences to be drawn therefrom.

We conclude that the judgment of the court awarding the bisected apex of the side line vein to the appellee, with appurtenant extralateral rights, should be sustained, because of the priority of discovery in the Big Jim claim.

The court adjudged costs to appellee. Appellant contends that the judgment is in this respect erroneous, because its title was quieted to the extralateral extension of the side line vein under the Big Jim surface on the pursuit of the vein from its apices in its own ground. The appellee claimed all portions of

the side line vein within the limits of its own surface boundaries extended downwards in vertical planes, and these issues were not only made by the pleadings but were contested upon the trial. It did not succeed in establishing its claim so made.

In actions to quiet title it is provided that—

"If the defendant appears and disclaims all right and title adverse to the plaintiff, the defendant shall recover his costs. In all other cases the costs shall abide the result of the action." Paragraph 1625, Rev. Stats. 1913 (Civ. Code).

No disclaimer was filed, and it is clear that the result of the action was adverse to appellee in the respect mentioned, and that by the operation of the statute costs should be adjudged to appellant. See *F. A. Hihn Co.* v. *City of Santa Cruz*, 24 Cal. App. 365, 141 Pac. 391; *Stimson C. & I. Co.* v. *People's Ditch Co.*, 31 Cal. App. 396, 160 Pac. 845.

The judgment will be modified, so as to award appellant its costs in this court and the court below, and, as so modified, affirmed.

ROSS, C. J., and McALISTER, J., concur.